[Nos. A129535, A131660. First Dist., Div. Two. Dec. 10, 2012.]

JULIE GILMAN VERONESE, Plaintiff and Respondent, v.
LUCASFILM LTD., Defendant and Appellant.

**COUNSEL**

Law Offices of Steven Drapkin, Steven Dràpkin; Paul, Hastings, Janofsky & Walker and Paul W. Cane, Jr., for Defendant and Appellant.

Altshuler Berzon, Michael Rubin, Caroline P. Cincotta; Law Offices of Joseph L. Alioto and Angela Alioto, Angela M. Alioto and Joseph Alioto Veronese for Plaintiff and Respondent.

**OPINION**

**RICHMAN, J.**—This is an employment discrimination case, specifically pregnancy discrimination. It is an unusual case in several respects, including that the interactions between plaintiff and defendant's representatives were relatively brief, over a period of less than four months; save for four in-person interviews or meetings and a handful of telephone calls, those interactions were all via e-mail; and plaintiff never worked one day in defendant's employ.

Plaintiff Julie Gilman Veronese sued defendant Lucasfilm Ltd. (Lucasfilm), alleging six causes of action. Following 11 days of testimony, five causes of action were submitted to the jury in a special verdict form. After three days of deliberation, the jury found for Veronese on three claims—pregnancy discrimination, failure to prevent pregnancy discrimination, and wrongful termination in violation of public policy. The jury found for Lucasfilm on the other two claims—retaliation and failure to accommodate disability. The jury awarded Veronese $93,830 for past economic damages and $20,000 for noneconomic damages, a total of $113,830. The trial court later awarded Veronese $1,157,411 in attorney fees.

Lucasfilm appeals from both the judgment and the fee award. The former appeal makes two arguments, the first asserting six separate claims of instructional error: the giving of two erroneous instructions, the refusal to give two proper instructions, and the failure to instruct on the elements of two of the claims submitted to the jury. Lucasfilm's second argument is that the damages awarded were the result of juror misconduct and have no support in the record. We agree there was instruction error, and conclude it was prejudicial. We thus reverse the judgment and vacate the attorney fee order.

## BACKGROUND

*Introduction*

As indicated, the relationship between the parties here was brief, and most of the interactions between them were in e-mails, the effect of which is that many of the facts could be said to be undisputed, especially as, with one exception, there was little disagreement as to the in-person interactions and the telephone calls. But whether undisputed or not, to the extent there are differing versions of what occurred, the appeal involves issues relating to jury instructions, and the prejudicial effect of any such error. Thus, " '[W]e do not view the evidence in the light most favorable to the successful [party] and

draw all inferences in favor of the judgment. Rather, we must assume that the jury, had it been given proper instructions, might have drawn different inferences more favorable to the losing [party] and rendered a verdict in [that party's] favor on those issues as to which it was misdirected. [Citations.]' " (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 655 [11 Cal.Rptr.3d 807].) So, "we recite the facts in the light most favorable to the claim of instructional error [citations] and we assume the jury might have believed [Lucasfilm's] version of the facts . . . [citations]." (*Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 839, fn. 1 [136 Cal.Rptr.3d 259].)

### *The Parties and the Participants*

Veronese was born in San Francisco and raised in the Bay Area. She attended community college, left school for a couple of years, and ultimately transferred to the University of California, Berkeley, from which she graduated with a degree in ethnic studies. Veronese was 36 years old in mid-2008, the time of the events involved here.

In 2006, Veronese married Joseph Alioto Veronese. Mr. Veronese is the son of San Francisco Attorney (and former supervisor) Angela Alioto and the grandson of the late Attorney (and San Francisco Mayor) Joseph L. Alioto. Mr. Veronese is himself an attorney, and Ms. Alioto and he represented Veronese throughout the case below and are cocounsel on the brief on appeal.

Defendant Lucasfilm is a privately held film and entertainment company founded by George Lucas (Lucas) in 1971. It has a campus in the Presidio in San Francisco and two properties in Marin County, Skywalker Ranch and Big Rock Ranch. Lucas lives in San Anselmo, at a property that was frequently referred to below as "Parkway" or the estate; it is a large complex with as many as nine houses on it. Sarita Patel, who had been hired by Lucas in 1993, was the estate manager. Patel generally supervised six employees, though if there were construction or other projects at the estate, she would oversee as many as 50 people. It is Patel who would become the focus of Veronese's claim here.

### *The Position*

In April 2008 Veronese was working for the Archdiocese of San Francisco when she received a call from her friend Erin Meyers, a recruiter at Lucasfilm, who told Veronese that at a meeting she heard of an open position as the assistant to the manager of Lucas's home—a position, as will be seen, that involved significant family caretaking.

Meyers's call, Veronese said, triggered her job search, and with help from Meyers she created a resume, which she sent to Kim Diaz, another recruiter at Lucasfilm. Following a series of e-mail exchanges, Veronese had a telephone "screening" with Diaz, followed by an in-person interview with her at the Lucasfilm campus in the Presidio. After the interview, they toured the campus and Diaz said she was going to recommend that Veronese meet Patel.

Veronese's resume was routed to Janetta Wood in Human Resources (HR), and from her to Patel, who described her initial reaction as "skeptical": in light of Veronese's connections, her family status, and the experiences listed on her resume, she was "too high profile" for a job that included many less-than-glamorous—if not downright menial—aspects.

On May 1, Patel sent Veronese's resume to Jane Bay, Lucas's long-time assistant, advising that she was interviewing Veronese the following day, and asking if Bay knew her. Bay responded that she "looks good on paper. I don't know her, sorry." Patel replied, "She's married to an Alioto and is incredibly connected in [San Francisco]. . . . I'm going to see what she's like just so I know." Bay responded minutes later: "Hmmmmmmm, may be too high class for the Parkway position. . . . I mean, will she pick up poop?" Patel responded: "Exactly. . . . This is what our hour [sic] department is giving me. What the???!"

The interview did not take place the next day, but following some rescheduling, on May 7 at Parkway. The meeting lasted some five hours, and both Veronese and Patel testified at length about what was discussed, with little discrepancy between the two accounts. Of significance here is that Patel asked Veronese if she "wanted to have children," to which Veronese responded, "yes," she did. Asked if she or Patel said anything else about that, Veronese testified on direct examination as follows:

"VERONESE: I don't recall that I said anything more than that. I mean, I was 36, so . . . this is something I have been looking to do. I have been trying since 2006. So this is just something that I was planning to do, and I just didn't think it was an issue.

"MS. ALIOTO: Okay. What did she say about having children, or being pregnant?

"VERONESE: She just said it was something that she needed to know, and that she said oftentimes when women get pregnant, that their hormones change, and they could change their mind about their work hours, or how they want to work, or how they see themselves. And she gave me an example

of a girl that worked there, a name wasn't mentioned, who changed her mind about her work hours and where she wanted to live after she got pregnant. [¶] . . . [¶]

"MS. ALIOTO: What was your response to her telling you that the other person's mind changed once they were pregnant?

"VERONESE: I just said that I don't consider myself that type of person. Both my parents are entrepreneurs. I grew up with them working my entire life, and it's just kind of who I am, and how I feel some sort of . . . working for me is how I feel some sort of worth, I guess just to find a better word, in the world. So it just wasn't an issue.

"MS. ALIOTO: What did you say about working while pregnant?

"VERONESE: That was something that I planned to do. [¶] . . . [¶]

"MS. ALIOTO: What did [Patel] say about the question she was asking?

"VERONESE: She just said she knew it was inappropriate, but it was something that she felt she needed to know.

"MS. ALIOTO: What did she say about HR?

"VERONESE: That sometimes I am out of step with HR."

Concerning this, Patel acknowledged she asked Veronese about plans for a family, a question, she further acknowledged, that was inappropriate in the eyes of the HR department. Patel asked the question, she said, because she wanted to know Veronese's view of family values, adding that it is important to know how a person applying for a position that included family caretaking felt about family. In fact, Patel had asked similar questions of others who would come to work at Parkway, including nannies and babysitters.

One other thing Veronese recalled about her interview with Patel she described this way: "There wasn't a discussion about mutual friends. However, she said that she was like a private investigator, so she Googled me. And I said, well, I Googled you, too. [¶] And she was asking me about the events I attended, or who I might know, because she just wanted to make sure that—I think, that I wasn't a flighty socialite . . . . I don't think of a socialite really in a positive context as it's been used here. But, yeah, she wanted to make sure that I wasn't out and about, I think, just in everybody's business and gossipy. So we had a very honest conversation about that."

Late on the afternoon of May 7, Wood e-mailed Patel, asking, "How'd it go with [Veronese] today," and advising that "I heard she might have another offer, so if you're really interested, we should probably get a game plan together." Patel e-mailed back almost immediately: "Great. She was great. I need to talk to g as the circle of common acquaintances is large. Very large."[1]

Early the next morning, May 8, Patel e-mailed Wood again: "Also—I have to have GL interview, and spend a half a day here with her. I did let her know this. . . ." Wood replied, "I met her last night and really liked her too. Hope all goes well with GL."

Patel testified about how important it was that her assistant be the "right fit." Asked what she meant, Patel explained that she looks at the assistant relationship as "almost like a marriage. . . . [Y]ou spend a lot of time with this person working on . . . intimate details, a lot of chaos. [¶] So the fit is how you get along. Do you bug each other? How you brainstorm together. How do you solve problems."

Patel decided to have Veronese "shadow" her for a day, so that Veronese could see firsthand what was involved in the job—and Patel's reaction. In her words, "I had some doubts in my mind about whether or not this would be a good fit. They were just my own internal doubts. And so I thought it would be a good exercise to have her shadow me to see if she really did find this job appealing, and to see how I would work with her. [¶] . . . [¶] . . . [T]he shadow date was an opportunity for [Veronese] to see what my day was like, to see how busy it was, to see how many telephone calls I got, to see the amount of area that I walk or run, you know, on a given day. To really just get a good overall picture of how incredibly complicated a typical day is, . . . ."

On May 12 Patel and Veronese exchanged e-mails, Veronese's saying, "OK. See you Friday at 11 am. [¶] I'm on the same page—I just want to understand the process/timing on my job opportunities so I am able to see them all through. Is it fair to say that if this works out, your timing is mid June? [¶] I am on vacation May 30-June 4." Patel responded: "Hi—[¶] Mid June would be when we are getting closer to a decision—[¶] I am trying to squeeze in two more people for gl to see also—so if we are able to manage doing that after he comes back, then mid June would be optimistic but ideal. . . ." Veronese responded: "Got it. Sounds good. [¶] Thanks! And I'll see you on Friday."

---

[1] Lucas was frequently referred to in e-mails as "gl" or "gwl."

The "shadowing" occurred on May 16, with Veronese spending some five hours at Parkway.

On June 6 Veronese e-mailed Patel that she "was back from vacation and looking forward to meeting again"; a similar e-mail followed on June 9. Patel responded that she was "working with gwl right now to schedule an appt? Hold tight. Welcome back from vacation."

By e-mail on June 18 Patel asked Veronese if she could "do a 1 month consulting gig with me?" Patel testified she made that proposal for two reasons: (1) she "did not have enough candidates [to consider] for the full-time position," and (2) Veronese said she had other job opportunities, and Patel wanted her to remain a candidate. As Patel put it, the temporary assignment "was just an idea I came up with to keep her in the process, not knowing when I would be ready with all the [other] candidates." And, she said, 30 days would allow her to see how Veronese "fit[] into the environment."

Veronese quickly replied: "I haven't made any commitments yet, and I'm still interested in pursuing an opportunity with you. [] I am looking for stability but I'm open to a one-month consulting gig. [] Is this for a specific project or is this a trial run for potentially a permanent position?? Can you give me anymore details?? It's interesting that you mention the consulting-[]concept because it seems to be coming up in my other interviews as well."

On the morning of June 24 Veronese met with Lucas's assistant Bay for two hours at Skywalker Ranch. Bay felt that Veronese was qualified for the position and could do the job, and following the meeting e-mailed Patel that Veronese was "GREAT!!!!"

Wood from HR prepared a two-page letter dated June 24 addressed to Veronese, which began as follows: "We are pleased to present the following offer of employment. This letter will summarize and confirm the details of our offer for you to join Lucasfilm, Ltd. in the position of Assistant to the Estate Manager commencing on June 30, 2008. You are being hired on a temporary, project-only basis. When the Project is completed, you will no longer be employed by Lucasfilm, Ltd. At that time, you may or may not be offered another job on a different project, depending on the needs of Lucasfilm, Ltd. Although it is anticipated that your Project will end on July

25, 2008, your employment may end before or after that date depending on your work performance and the needs of the Project." The letter went on at some length with the "specific details of our offer."

Veronese signed the letter on June 25, writing in hand that her start date was "6/30/08." This, Veronese acknowledged at trial, "was a tryout so [Veronese] could prove [her] skills" to Patel. If she failed, that would be the end of it.

### The Pregnancy

On June 27, Veronese called Patel to tell her she was pregnant. She went on that she had been "feeling nauseous and sick," and "asked her if [she] could come in a little later on Monday [June 30]."

Asked what Patel said, Veronese answered as follows: "So the tone changed. And maybe out of concern. I'm not sure. But she was definitely very adamant, and she said, 'If you want to work for me, you listen to me. Your health is the most important thing. You take care of yourself. The job isn't going anywhere. I'm not going anywhere. We'll be here for you.' [¶] And then she said, 'You're not going to be a hundred percent on Monday. Don't come here on Monday at 9:00 o'clock.' And I was a little shocked. I thought okay. This will give me some time to actually be a hundred percent."

That same day Patel e-mailed the news to Bay: Veronese "[c]alled me. She is pregnant." Bay responded almost immediately, "Oh noooooooo. Does that mean she won't be able to take the job?????" Patel wrote back that Veronese would not be coming in the following week because "she is feeling really badly so I told he[r] to take care of herself, make all her appts and feel better. I will postpone her tryout. I think it[']s just the right thing to do. [¶] Roll with the changes, right?" Bay replied, "Yes, but doesn't that brings [sic] up some issues about whether she would be able to do this job just being pregnant (first trimester) and then going out on a three month maternity leave. That's a hard one to call. I can't help but worry about it, and want so much for you to have the right person as your Executive Assistant."

On June 30 Veronese e-mailed Patel about upcoming doctor's appointments, ending the e-mail with this: "Thank you for being so understanding. I am so appreciative." Patel e-mailed back that she "did tell [Diaz] that you wouldn't be coming in today—and that the project was on hold for timing due to your being sick. Just had to do that for the paperwork. [¶] I hope you're doing well. Keep me posted. I do care!" That same day Veronese sent an e-mail to Diaz, confirming that she believed Patel had communicated to Diaz that she was "pretty sick."

Four days later, July 4, came Veronese's e-mail to Patel with this news: "Twins!! Yes, we're having twins. It's been a crazy week or so." Patel responded that day: "Holy moly!! This is unbelievable. His [*sic*] reaffirms everything I believe about the universe having a plan way bigger than what we are able to control. I'm so happy for you guys!!! Happy 4th of July! [¶] Xo Sarita." Asked at trial about Patel's response, Veronese said she thought Patel was "really thrilled" and "extremely happy for [her]."

On July 9 Patel e-mailed Veronese, asking, "How are you feeling? Just checking in, that's all." Veronese replied, "I'm ok. Instead of feeling ill constantly, it seems to be more in waves now. Thank you for asking."

On July 17 Veronese e-mailed Patel: "Hi, Sarita. Just checking in. I'm 11 and a half weeks. Can't hardly believe it still. It's been a rocky road. Just when I think I'm starting to feel better, the queasies start again. I'm really hoping that I start feeling better by the end of the month, and we start working together."

Patel had been scheduled to take a week's vacation in early August, and Wood had suggested to her that Veronese "could come in when you get back from vacation. You'd have a few weeks to work with her and test things out." This led to a series of e-mails between Veronese and Patel on July 22, beginning with Patel's: "I was scheduled to go on vacation august [*sic*] 1st. I have been working 24 7 for the last few months and really need to recharge. I am also in the middle of losing Jenna who is going back to school after long consideration. Can you please give me some time to think about how I'm going to work out the business I have most effectively given everyone's lives including my own?? I aPpreciate [*sic*] your understanding. I just can't overload myself at the moment before I think things through. [¶] Thanks."

Veronese responded: "I think I understand your email but I just want to clarify. It sounds like August 1 you will be going on a much needed vacation therefore that would not be a good day for me to start working with you. [¶] Secondly, it sounds like you are saying that you are not sure what capacity, if any that you and I will be working together and that you need time to figure that out? Sorry for the added pressure but please clarify as I was looking forward to starting our work together August 1 or shortly thereafter."

Patel answered: "I can do it when I come back from vaca. [¶] What I'm trying to sort out is working with you or any new person right before I leave or right after. Since our original project was to end at end of july [*sic*] and I had no idea I'd be this burnt out, I'm trying to be thoughtful. That's all. I know nothing until I layout the load. I can't have anyone working here if I'm gone obviously, so its [*sic*] a question of whether I reschedule my personal time or how I work it all out. [¶] How are you doing?"

Minutes later, Veronese responded, in an e-mail that reads in its entirety as follows: "Got it. I understand. [¶] Actually got some good/bad news yesterday. One of the babies [*sic*] heart stopped beating but the other baby looks strong. It must have happened right after my 9 week ultrasound. It's sad but I truly believe these things happen for very good reason. [¶] When do you return from vacation?"

Almost immediately, Patel wrote back: "Oh my god!! I'm processing." Elaborating about this at trial, Patel said she felt "really, really bad," having had miscarriages of her own, and having worked with others who also had miscarried.

Meanwhile, according to Patel the stress of her job at Parkway continued. On July 24, for example, she sent Wood a letter from a neighbor complaining about what "the Lucas estate [was] doing in their neighborhood." Patel commented to Wood that this was the "kind of thing I deal with on an ongoing basis"; "People in this neighborhood operate in a mode of unbelievable anger." "I personally am afraid to bring on a pregnant person and how important the stress that is around here can affect health . . . . I'm thinking I should have Julie do a project—clearly outline it and have her do it for one month. There is no way I can see someone in this condition following me around and not have it affect her health." As Patel would explain at trial, "the job was really stressful at that time . . . and I was afraid of Julie having lost [a] twin." She was also concerned about Veronese being exposed to dust and paint fumes.[2]

Nevertheless, Patel agreed with Wood's suggestion that Patel proceed with the tryout, to begin on August 11, on Patel's return from vacation, and to last three weeks, until the end of August.

On July 28, Veronese called Diaz to ask about the new start date, and also asked Diaz why the 30-day period had been shortened. Diaz responded that Patel was "being sensitive to [your] situation." Veronese responded that was "none of [Patel's] business and that's not up to her to decide. That's up to me to decide."

The next communication in the record is Veronese's e-mail on the afternoon of August 7. That e-mail, sent to Wood with a copy to Patel, was six paragraphs long, and read in its entirety as follows:

---

[2] Veronese had been warned by her doctor to avoid strong odors.

"Dear Janetta and Sarita,

"As you know my start date is scheduled for August 11. I have thought long and hard about this amazing opportunity, one that I've often described as 'my dream job' and at this point feel conflicted about starting on Monday.

"I accepted the 30 day employment contract with Lucas to start on June 30 under the assumption that if all went well, I would become a permanent employee. After 2 1/2 months of interviewing, constant communication and validation from others, I was pretty confident that my employment would continue past the 30 day mark.

"As you know, I found out I was pregnant a few days before my scheduled start date and due to feeling very sick had to postpone my start date. Kim, Sarita and I regularly kept in touch and I communicated that I thought I would be ready to start work by August 1.

"Janetta, I am very appreciative that you acted so quickly upon receiving my email and were able to get in touch with Sarita and get a new start date. My email was never intended to push Sarita into making a decision she wasn't ready to make however with the new start date I was a little surprised that the contract had been shortened due to scheduling. If the goal was to make me a permanent full time employee, I'm not sure why scheduling was an issue. I understand you feel that the shortened contract would still give me time to prove myself and also evaluate if the job is still for me. I hope you understand that by shortening my contract, not only does it create a sense of doubt in my mind about Lucas's commitment to me, it tells me that I am being set up to fail. I can't help but think that things have changed because I am pregnant.

"When I signed up to work for Lucas, I had been interviewing at several other companies, looking for full time permanent work. I would not have given that up had I known that down the road my employment would be questioned or shortened—that was never an option that was presented to me.

"I am looking for a job where I can work hard and be welcomed into the Lucas family and I no longer feel that to be true. I have been led to feel as though I am no longer a good fit for the job due to my pregnancy. If you agree, please let me know and I will continue my search for employment. Please have a frank discussion with Sarita about the needs and expectations of the job and if I am still a good fit for this job or perhaps another full-time or part-time job. I appreciate your frank response and look forward to moving forward or moving on.

"Sincerely,

"Julie Veronese."

Patel testified that on receipt of plaintiff's e-mail she was "angry"; indeed, as she would later e-mail Wood, she was "furious." And, she told Wood, this was especially so in light of Patel's own job stressors, which had caused her to cancel her vacation a fifth time: "I have NO room for someone who after working with me for even one day can[not] see that I need 100% strong dedication and no worrying. [¶] I cut the thing short two weeks because I do not have the time anymore."[3]

Patel described the reason for her reaction was her perception of Veronese gleaned from the e-mail which, she said, was "very revealing." Patel went on to describe concerns about candor, integrity, flexibility, and the potential for misunderstanding or miscommunication. Perhaps most importantly, Patel perceived selfishness in Veronese's e-mail, that she was thinking about herself rather than providing support. In short, the e-mail raised "red flags" to Patel, including that Veronese felt she was "entitle[d]," that she was not service-oriented, and that she had unreasonable expectations.

Veronese's e-mail prompted an e-mail from Patel, intended for Wood but sent in error to Veronese: "Excuse me for being frank, everyone knows to some degree how much I have on my plate and how much I need a support staff. I have been dealing with someone in my group who has attempted suicide and honestly I am trying to get thru this every emotional and devastating time and also attend to my job responsibilities. [¶] I have cancelled my 5th vacation so I could attend to these added needs at work. I do not have time to deal with this unless you let me know why in the heck she thinks it's because she's pregnant if I never said one thing about it. My time is so incredibly precious right now and it is vital that I stay focused. Please talk to me now. Thanks."

Veronese sent Patel's e-mail to Wood, who responded to Patel that she was unavailable until 6:00 p.m. or so. Patel replied that "I'm going to respond to her—or do I need to talk to you first." Patel then sent her own lengthy e-mail to Veronese on the afternoon of August 7:

"Julie,

"As you know, this work environment requires my position to always go with the flow no matter what.

"You saw me in action and I gave you valuable time because I value this position and what it means to me.

---

[3] According to Patel, her personal work situation worsened during late July and early August. This caused her not only to cancel her planned vacation, but also to send an emotional letter to Lucas underscoring her need for assistance and expressing significant concerns about her own situation.

"This position requires Mr. Lucas to interview candidates too and his schedule has been and will continue to be the most difficult item to navigate.

"I changed the 30 day to 2 weeks only because I was supposed to go on vacation. A much needed vacation.

"I have not gone on vacation because of some things that have come up here that required my deepest attention.

"1) The neighborhood has formed a group to stop the construction we are doing here. This has taken up so much time, I can't tell you.

"2) One of the people in my group, that I am responsible for is suicidal and I have been primarily alone trying to deal with this incredibly difficult and emotional issue.

"3) I have spent 22/30 days overnighting here while Mr. Lucas has been out of town. I am tired too and I have no problem admitting it.

"Julie, I don't know where you were led to believe that because of your pregnancy, you are no longer a good fit.

"This truly, concerns me, because if anything, I have discussed how the impacts of this construction in and out of the house might impact you in a negative way. I have been ultra sensitive to not exposing you to things and have actually worked every weekend to try and get the possibly toxic smells out of the house. I wanted no paint fumes no heavy sanding on the porch. No toxic environment. And I asked Janetta—Will the conditions of this house and all the construction be bad for her? To hear you say you think things have changed because of your pregnancy is just unbelievable to me because I was trying to help you.

"I am hurt, I am not sure that feeling this way is good for me and moving thru the day. It has actually made me feel like everything I did to just make it happen was a waste. You had no idea what I was doing and I was truly just trying to get this place ready for you and to deal with things so I would have the time for you that you deserved.

"I know you need to work. I also know how much I need to find the right person and that takes a lot of time, given George and my schedules. George needs someone who will be here for at least 5 years.

"I do not think at this point it will be good for us to continue this project given the real time constraints I am under to take care of the sick person here

and dealing with the neighbors who are on their 2nd year of straight construction. It is a very stressful time here and working around the clock to put gas in cars, answer the gate, drive the kids here and there . . . requires my being completely flexible.

"To me, I merely aborted the project so I could go on vacation.

"I gave you time and did not question it at all. My decisions however are making you feel unsettled and for that I am sorry, but I can't change your feeling about that.

"It is an amazing place here. That's why I'm at it 24/7. I have a lot of changing I need to do here with staffing as I shared with you. I am hoping we can just keep the channels open in the future to keep in touch.

"Thank you for taking the time to read this."

After some e-mails back and forth with Veronese, Wood suggested Patel call Veronese to attempt to work it out, so that Veronese could still start on August 11, sending an e-mail to Patel that read: "Can you please call her? I hate for this all to be decided via email with the two of you never speaking directly. . . . [¶] . . . I think this could still work out for her to give the job a shot with original trial period agreement. I've asked Kim to call here as well to reiterate the conversations they had in the beginning about this being a way for you both to see if the job was a fit."

Patel called Veronese and left a message. Veronese called back the next day, August 8, and they talked for some 10 minutes. As Patel described it at trial, she "was open to [Veronese] starting on Monday. I wanted to get on the phone with [Veronese]. I wanted to hear her voice. I wanted her to hear my voice, and I wanted to make sure that, you know, we reached some sort of going-forward point, which was starting on Monday."

Patel described the conversation as one in which Veronese agreed that the position would not be a good fit due to the stresses they were both under and the realities of the position. They discussed whether there might be other possible opportunities at Lucasfilm, and Veronese said she would talk with Diaz about working at the Presidio. Patel agreed with this, and her perception was that their conversation ended well, with a mutual sense of relief. Patel did not tell Veronese that she was fired, or that the project was over, or not to show up on Monday because she was not wanted.[4]

---

[4] The telephone conversation is the one exception noted above where there was some material difference in the testimony. Asked what was said in this conversation, Veronese testified as follows: "Right away, it was, 'I don't want to get into the he said, she said. I don't

After the call, Patel responded to Diaz and Wood that there was a mutual agreement that she and Veronese would not be working together. And on August 8 Wood sent Veronese this two-sentence letter: "This letter is to confirm the end of your employment with Lucasfilm Ltd., effective August 8, 2008. Please don't hesitate to call me . . . if I can be of assistance."

Toward the end of that day, August 8, Veronese and Diaz spoke by telephone to set up a meeting, and shortly thereafter met in the lobby of the Lucasfilm campus at the Presidio, where they discussed Veronese looking for another job at Lucasfilm. According to Diaz, Veronese told her that she and Patel had agreed that she would not be working for Patel.

On August 11, Wood talked with Veronese regarding her August 8 conversation with Patel, which conversation indicated to Wood that a mutual agreement had been reached. Wood testified she said, "I understand that you agree it wasn't going to work out for you guys to start working together," and that Veronese agreed. In fact, Veronese did not say anything other than, "I am looking forward to other open positions within the company."

On August 19, Lucas interviewed candidates for the position of Patel's assistant, and Kelly Wolfe was selected for the position. She had, Lucas said, personal qualities and prior relevant work experience that made her the superior candidate.

On August 26 Veronese filed a complaint with the Department of Fair Employment and Housing, requesting an immediate right to sue letter. She got it, and then filed her complaint.

*The Proceedings Below*

On April 1, 2009, Veronese filed a complaint against Lucasfilm, alleging six causes of action, styled as follows: (1) gender discrimination/wrongful termination; (2) gender discrimination/failure to promote/hire; (3) failure to prevent and investigate discrimination; (4) retaliation; (5) failure to accommodate; and (6) wrongful termination in violation of public policy. The first five claims were alleged as violations of the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.; FEHA); the sixth was a common law claim.

---

want to get into details.' And she explained the environment at the house and the neighbors, and how stressful everything was, and I was listening to her, and I almost felt even—like even before I got a chance to answer, she threw out the suicide attempted suicide with a family member, and it was a family member I knew. And so it kind of shut me up really fast because I felt really bad. It was no longer about me at that point. It was like, 'Wow, okay. This is serious.' And I told her how sorry I was, and I said how stressful that was, and she said, 'So you know, this is just not a good place for anyone to work.' And I said, 'So you are telling me you are not hiring anyone for this position?' And she said, 'That's right.' "

Lucasfilm filed its answer on May 1, and vigorous litigation ensued, resulting in a 44-page register of actions. The numerous pretrial proceedings were handled by the Honorable Verna Adams, to whom the matter had been assigned from inception. In August 2009 Judge Adams set the matter for jury trial for May 7, 2010, and the following months saw numerous discovery disputes, most of which were resolved generally in favor of Lucasfilm.

On April 21, 2010, two weeks before the trial date, Veronese filed a challenge to Judge Adams based on claimed bias. Represented by counsel, Judge Adams filed a verified answer to the challenge. The Honorable Robert Weir of Del Norte County was assigned to hear the challenge, and by order dated May 5 denied it. Notwithstanding that denial, on May 20, acting ex parte and apparently on her own, Judge Adams assigned the matter to the Honorable Lynn O'Malley Taylor, a retired superior court judge sitting by assignment. On May 25 Judge Taylor set the matter for trial on May 27.

*The Trial and the Verdict*

Following motions in limine and jury selection, testimony began on June 7 and was taken over 11 days. Closing arguments concluded on June 25 and, following concluding instructions, the case was in the hands of the jury that day. It was 2:41 p.m. The jury deliberated for the remainder of June 25, all day on June 28, all day on June 29, and for most of the morning of June 30. At 11:57 a.m. the jury returned with its special verdict, finding for Veronese on three of the five claims submitted to it: pregnancy discrimination, failure to prevent discrimination, and wrongful termination in violation of public policy. The jury found for Lucasfilm on the claims for retaliation and failure to accommodate disability.

The jury awarded Veronese $93,380 for past economic damages and $20,000 for noneconomic damages, a total of $113,830. The jury also found that Patel engaged in "conduct with undue oppression or fraud," but that she was not a managing agent of Lucasfilm.[5]

On August 2 Lucasfilm moved for a new trial and for a partial judgment notwithstanding the verdict (JNOV).[6] Veronese also moved for a judgment

---

[5] The votes on the special verdict were not all unanimous. One juror concluded that pregnancy was not a motivating reason for Veronese's termination. And two jurors concluded that neither the termination nor the failure to promote was a substantial factor in causing harm.

[6] One of the grounds for Lucasfilm's new trial and JNOV motions was that the jury's verdict was not based on evidence produced at the trial. This forms the basis for a creative argument Lucasfilm advances on appeal attacking the damages awarded. The argument is stated in its opening brief as follows: "The jury here awarded $113,830 in damages. That figure has no support in any piece of evidence. There is no doubt, however, where the number came from.

notwithstanding the verdict, arguing that Patel was a managing agent. On August 27 Judge Taylor denied all three motions. That same day Lucasfilm filed a notice of appeal, and on September 15 Veronese also filed a notice of appeal.

### The Motion for Attorney Fees

On October 8, 2010, Veronese filed a motion for attorney fees, seeking a total of $2,549,240, based on a lodestar of $1,555,775, enhanced by a 1.6 multiplier, plus $60,000 for the fee motion itself. On February 3, 2011, Judge Taylor issued a statement of decision awarding Veronese a total of $1,157,411—$1,100,686 in attorney fees (including a 1.2 multiplier) and $56,725 for the fee motion.

On April 11 Lucasfilm appealed from the fee order in case No. A131660, and we ordered the appeals consolidated.[7]

## DISCUSSION

Lucasfilm's first argument is that Judge Taylor erred in connection with the jury instructions, asserting six particular claims of error: the giving of two erroneous instructions proposed by Veronese; the refusal to give two instructions requested by Lucasfilm; and the complete failure to instruct on two issues submitted to the jury.

### The Instruction on Causation

Judge Taylor instructed the jury that it should find for Veronese if her pregnancy was "a motivating reason" for Lucasfilm's decision, specifically instructing as follows: "Julie Gilman Veronese must prove . . . [t]hat [her] race, gender or pregnancy, or her complaint about pregnancy discrimination was a motivating reason for the discharge . . . ." And "A motivating reason is a reason that contributed to the decision to take action, even though other reasons also may have contributed to the decision." The instruction was based on CACI No. 2500.

Lucasfilm's first claim of instruction error is that the jury was "incorrectly instructed on causation; the CACI instructions are wrong."

---

The jury plainly set damages, not based on evidence, but based on the number '1138' [that is] ubiquitous in George Lucas' films. The '30' tacked on at the end came from the massively publicized 30th anniversary celebration of Lucasfilm's blockbuster, *The Empire Strikes Back*, which began the week before trial." We do not address the argument because we conclude there was prejudicial instructional error.

[7] Our order actually ordered consolidation of three appeals, including Veronese's appeal, which was later dismissed at her request.

This issue was the subject of extensive argument below, including with written pretrial briefs on the issue. Lucasfilm's fundamental position was there, and is here, that the appropriate test for causation is the "but for" test, and proposed such an instruction. In short, Lucasfilm's fundamental position is that FEHA imposes liability "because of" discrimination (Gov. Code, § 12940, subd. (a)), and "because of" means that Veronese had to show that discrimination had a determining effect—was a "determining factor"—on the employment decisions. (See generally *Gross v. FBL Financial Services, Inc.* (2009) 557 U.S. 167, 176–177 [174 L.Ed.2d 119, 129 S.Ct. 2343].)

This issue is presently before our Supreme Court, in *Harris v. City of Santa Monica,* review granted April 22, 2010, S181004, which held that giving only CACI instruction No. 2500 in a pregnancy discrimination case was error, as a "mixed motive" defense remains available to employers in appropriate circumstances. We deem it unnecessary to weigh in on the issue, for even if the giving of CACI No. 2500 is held to be proper under California law, reversal would be required due to errors in other instructions—errors, we conclude, that were prejudicial.

### *It Was Error to Refuse a "Business Judgment" Instruction*

Lucasfilm proposed special instruction No. 9, as follows: "You may not find that Lucasfilm discriminated or retaliated against Julie Gilman Veronese based upon a belief that Lucasfilm made a wrong or unfair decision. Likewise, you cannot find liability for discrimination or retaliation if you find that Lucasfilm made an error in business judgment. Instead, Lucasfilm can only be liable to Julie Gilman Veronese if the decisions made were motivated by discrimination or retaliation related to her being pregnant."[8]

It is not clear from the record that Veronese opposed the instruction. Whether she did or not, Judge Taylor refused to give it, without giving a reason why. At one point Judge Taylor did say she was "not giving special instructions,"[9] though she did go on to give a few special instructions. But she did not give No. 9, as to which the only reference in the record is this: "Yes. [Special instruction] 5 in, 8 in. What is this? We don't need 9. We don't need 10. We've already talked about litigation."

Refusing this instruction was error.

---

[8] This instruction has been referred to, including by the parties, as the "business judgment" instruction, a term we will use here.

[9] The *complete statement was this:* "No. We have an instruction on damages. So I'm not giving proposed No. 3 either. [¶] I'm not giving special instructions. We have good instructions already. Except may 82 [*sic*]."

 Numerous California cases contain language similar to that proposed in special instruction No. 9. As our colleagues in Division One have put it, a plaintiff in a discrimination case must show discrimination, not just that the employer's decision was wrong, mistaken, or unwise. (*Reeves v. MV Transportation, Inc.* (2010) 186 Cal.App.4th 666, 673–674 [111 Cal.Rptr.3d 896].) Or, as another Court of Appeal has said, " 'The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason. . . . "While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is . . . whether the given reason was a pretext for illegal discrimination. The employer's stated legitimate reason . . . does not have to be a reason that the judge or jurors would act on or approve." ' " (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 344 [77 Cal.Rptr.3d 654]; accord, *Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005 [67 Cal.Rptr.2d 483].)

In *Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 358 [100 Cal.Rptr.2d 352, 8 P.3d 1089], the Supreme Court affirmed a summary judgment for the employer in an age discrimination case. Doing so, the court noted as follows: "On the other hand, if nondiscriminatory, Bechtel's true reasons need not necessarily have been wise or correct. [Citations.] While the objective soundness of an employer's proffered reasons supports their credibility . . . , the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*. Thus, 'legitimate' reasons [citation] in this context are reasons that are *facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding *of discrimination*. (See, e.g., *Kariotis v. Navistar Intern. Transp. Corp.* (7th Cir. 1997) 131 F.3d 672, 676 [suggesting that proffered reasons, if 'nondiscriminatory on their face' and 'honestly believed' by employer, will suffice even if 'foolish or trivial or baseless']; *McCoy v. WGN Continental Broadcasting Co.* (7th Cir. 1992) 957 F.2d 368, 373 [ultimate issue is whether employer 'honestly believed in the reasons it offers']; see also *Fuentes v. Perskie* (3d Cir. 1994) 32 F.3d 759, 765 [issue is discriminatory animus, not whether employer's decision was 'wrong or mistaken,' or whether employer is 'wise, shrewd, prudent, or competent'].)"

As Lucasfilm acknowledges, the numerous California cases that have articulated the business judgment rule in the employment context are all summary judgment cases. Lucasfilm has not cited, and we have not found, any California case discussing this principle in connection with a jury instruction in a FEHA case.[10]

---

[10] The issue of possible jury instruction error on this issue has arisen in employment litigation involving implied-in-fact contract. (See, e.g., *Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93, 109 [69 Cal.Rptr.2d 900, 948 P.2d 412] [new trial ordered where the court refused to instruct the jury not to substitute its opinion for that of the employer, that jury

Several federal cases have discussed the issue in the context of a jury instruction, however, and have held that refusing to give a business judgment instruction was prejudicial error.

*Walker v. AT & T Technologies* (8th Cir. 1993) 995 F.2d 846 (*Walker*) is illustrative. There, Walker's employer promoted a younger employee, and she brought an action for age discrimination. A jury found for Walker, and awarded backpay; the district court awarded front pay, liquidated damages, and prejudgment interest. (*Id.* at p. 847.) The employer appealed, asserting two grounds, the second of which was the district court's refusal to give a jury instruction that read as follows: " 'It is not unlawful for an employer to assign work to an employee, or require that employee to meet certain performance standards or expectations where the action is based on factors other than age. It is not unlawful for an employer to discriminate against an employee because of the employer's view of the employee's capabilities. [¶] . . . [¶] Put another way, the basic principle is that an employer has the right to assign work to an employee, to change an employee's duties, to refuse to assign a particular job to an employee or even to discharge an employee for good reason, bad reason, or no reason at all absent intentional age discrimination. . . .' " (*Id.* at p. 848.)

The Court of Appeals reversed, concluding that refusal to give the instruction was reversible error. (*Walker, supra,* 995 F.2d at pp. 849–850.) Recognizing that the issue was one of first impression, the court began its analysis with reference to general principles from earlier Eighth Circuit cases, including this: "*Neufeld v. Searle Laboratories,* 884 F.2d 335, 340 (8th Cir. 1989) (recognizing that 'courts have no business telling Searle how to make personnel decisions, which may be objectively or subjectively based'), and *Bell v. Gas Service Co.,* 778 F.2d 512, 515 (8th Cir. 1985) (affirming the district court's grant of j.n.o.v. and reiterating that the intent of ADEA is not to review the correctness of an employer's business decision). In these cases, we recognized that an employer may exercise business judgment in making personnel decisions. *See also Jorgensen v. Modern Woodmen of Am.,* 761 F.2d 502, 505 (8th Cir. 1985) (observing that 'the ADEA is not intended to be used as a means of reviewing the propriety of a business decision . . .'); *Smith v. Monsanto Chem. Co.,* 770 F.2d 719, 723 n. 3 (8th Cir. 1985) (recognizing that an employer may develop arbitrary, ridiculous and even irrational policies as long as they are applied in a nondiscriminatory manner), *cert. denied,* 475 U.S. 1050 [89 L.Ed.2d 581, 106 S.Ct. 1273] (1986). The Supreme Court has also stated that '[t]he fact that a court may think that the

should be instructed that "the question critical to defendants' liability is not whether plaintiff in fact [engaged in misconduct]," but whether the defendant "had reasonable grounds for believing plaintiff had done so"]; *Pugh v. See's Candies, Inc.* (1988) 203 Cal.App.3d 743, 770 [250 Cal.Rptr. 195].)

employer misjudged the qualifications of the applicants does not in itself expose [the employer] to Title VII liability . . . .' *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 259 [67 L.Ed.2d 207, 101 S.Ct. 1089] (1981)." (*Walker, supra,* 995 F.2d at p. 849.) And so, the court concluded, "AT & T had the right to have the jury instructed as to this principle of substantive law, particularly on the record before us." (*Ibid.*)

*Scamardo v. Scott County* (8th Cir. 1999) 189 F.3d 707, 710–711 is similar, granting a new trial for refusal to give a business judgment instruction, there in a retaliation case. The court held: " '[I]n an employment discrimination case, a business judgment instruction is "crucial to a fair presentation of the case," [and] the district court must offer it whenever it is proffered by the defendant.' [Citation.] We think this directive applies with equal force to this employment retaliation case." (*Id.* at p. 711; *Wolff v. Brown* (8th Cir. 1997) 128 F.3d 682, 685 [same]; see *Hefferman v. Bd. of Trustees of Illinois Community College* (7th Cir. 2002) 310 F.3d 522, 529 [approving instruction]; *Deines v. Texas Dept. of Protective & Regulatory Services* (5th Cir. 1999) 164 F.3d 277, 280–281 [same].)

Various state courts have also held that it was error to refuse a business judgment instruction. (See, e.g., *Marin v. American Meat Packing Co.* (1990) 204 Ill.App.3d 302 [149 Ill.Dec. 818, 562 N.E.2d 282, 287] [ordering new trial for refusal to give business judgment instruction, noting that "Each party . . . has the right to have the jury instructed on its theory of the case . . . ."]; *Schuhmacher v. North Dakota Hospital Assn.* (N.D. 1995) 528 N.W.2d 374, 382 [holding that business judgment instruction should be given because, without it, jury "may erroneously base a finding of illegal employment discrimination merely on its views regarding the soundness of the defendant's business judgment, or its perception of fairness"].)

Veronese virtually ignores the federal and out-of-state cases cited by Lucasfilm, mentioning only two of them (*Walker* and *Schuhmacher*), and asserting they are distinguishable because neither had an instruction about "at will" employment, which Judge Taylor gave here.[11] We do not understand how that overcomes the problem.

Veronese asserts that Lucas's proposed instruction was "incorrect and redundant," arguing that the instruction that Veronese had to prove that pregnancy was a "motivating reason" for Lucasfilm's action covered the issue. We disagree.

---

[11] The instruction said, "All employment in California is what is called 'at will,' unless there is a written contract providing that the employee can only be terminated for 'good cause.' At will employment means that either the employee or the employer may end the employment relationship at any time, for any reason, or for no reason, except that the employer may not end the employment relationship if motivated to do so by discrimination or retaliation."

■ As to the assertion that the instruction was incorrect, Veronese claims the first sentence is "legally inaccurate." While we do not agree, even if it were the answer is found in *Walker*, where the Court of Appeals observed as follows: "We acknowledge that AT & T's instruction is not a model and it contains excess language. A trial court generally may refuse to give any instruction that is not entirely correct. Nevertheless, when a proposed instruction addresses an issue that is crucial to a fair presentation of the case to the jury, the trial court has the obligation to give an appropriate instruction on that issue, not necessarily in the wording of the proposed instruction." (*Walker, supra*, 995 F.2d at p. 849.) Such obligation would pertain here, as recognized by the many cases holding that courts have an obligation to fix incorrect instructions, especially if the fix is easy, so that the jury is not "inadequately instructed on a material issue in the case." (*Laird v. Moss* (1959) 173 Cal.App.2d 48, 53 [342 P.2d 463] ["The few redundant words could have been crossed out with the stroke of a pen."]; see *Logacz v. Limansky* (1999) 71 Cal.App.4th 1149, 1159 [84 Cal.Rptr.2d 257].)

■ Here, for example, the jury could have reacted to Veronese's August 7 e-mail differently than did Patel, or perhaps concluded that she overreacted. Regardless, under the law Patel was entitled to exercise her business judgment, without second guessing. But Judge Taylor refused to tell the jury that. That was error.

*The Instruction About Potential Hazard to a Fetus Was Error*

Veronese proposed, and Judge Taylor gave, an instruction that said, "A potential hazard to a fetus or an unborn child is not a defense to pregnancy discrimination." The sole authority cited below in support of the instruction was *Automobile Workers v. Johnson Controls, Inc.* (1991) 499 U.S. 187 [113 L.Ed.2d 158, 111 S.Ct. 1196] (*Johnson Controls*). In her brief here Veronese also cites, without discussion, *Johnson Controls, Inc. v. Fair Employment & Housing Com.* (1990) 218 Cal.App.3d 517 [267 Cal.Rptr. 158]. Lucasfilm contends that giving the instruction was error. We agree. Neither case supports giving the instruction here.

*Johnson Controls* was a class action brought to challenge the employer's policy, described by the Supreme Court as a "broad exclusion of women from jobs that exposed them to lead." The policy provided as follows: " '[I]t is [Johnson Controls'] policy that women who are pregnant or who are capable of bearing children will not be placed into jobs involving lead exposure or which could expose them to lead through the exercise of job bidding, bumping, transfer or promotion rights.' " (*Johnson Controls, supra*, 499 U.S. at p. 192.)

The district court granted summary judgment for the employer based on the "business necessity" defense. (*Johnson Controls, supra,* 499 U.S. at p. 193.) The Court of Appeals affirmed. The Supreme Court reversed, holding that the employer's "fetal-protection policy explicitly discriminates against women on the basis of their sex." (*Id.* at p. 197.) Thus, *Johnson Controls* held that the employer's *policy* could not pass muster, a policy that extended to any woman " 'capable of bearing children.' "[12] (499 U.S. at p. 192.)

Lucasfilm had no such policy, and no policy was involved here, only one 36-year-old pregnant woman who had already miscarried one twin. Thus, no case law dealing with any employer policy can support what was said to the jury here. Nor could the issues in the case.

What the instruction says is undoubtedly accurate in the abstract, especially as we do not understand that *anything* is a defense to discrimination, whether pregnancy or otherwise, if such discrimination there be. But Lucasfilm did not contend—nor could it—that any concern for a fetus was a "defense to discrimination." So, even if the instruction were literally true, abstractly correct, it was not proper.

■ The law has long been that " '[a]n instruction is erroneous if, though *abstractly correct* as a statement of law, it is not within the issues developed by the evidence or reasonable inferences therefrom. And if it is likely to mislead the jury the error is prejudicial.' " (*DeGeorge v. Crimmins* (1967) 254 Cal.App.2d 544, 547 [62 Cal.Rptr. 394]; see *LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 875 [148 Cal.Rptr. 355, 582 P.2d 946], and numerous cases and authorities there collected; *Gregg v. McDonald* (1925) 73 Cal.App. 748, 757–758 [239 P. 373] [instruction correct in the abstract may not be given if it is likely to mislead the jury]; *Joyce v. Simi Valley Unified School Dist.* (2003) 110 Cal.App.4th 292, 303 [1 Cal.Rptr.3d 712] [same].) The court in *DeGeorge* said the instructions "had no relation to the evidence developed, or to any theory of defendant's case, and . . . had a tendency . . . to mislead the jury." (*DeGeorge v. Crimmins, supra,* at p. 547.) Likewise here.

As discussed at length above, there is no question there was much evidence about Veronese's condition, and Patel's (and Lucasfilm's) claimed concern about it. There is also no question that under Lucasfilm's view of the case, it did what it did, beginning with delaying the original June 30 start date, because of how Veronese was feeling. And there is also no question that

---

[12] The California *Johnson Controls* case was similar. It involved a "fetal protection program" which had the effect of denying production work to all women of " 'childbearing capacity.' " (*Johnson Controls, Inc. v. Fair Employment & Housing Commission, supra,* 218 Cal.App.3d at pp. 525–526.)

Lucasfilm did not contend that it denied Veronese the position out of concern for her well-being or that of the fetus. In other words, Lucasfilm did not attempt to justify what Veronese claimed was an adverse employment decision based on any concern for the fetus.

Notwithstanding that, Judge Taylor gave an instruction that could well mislead the jury, one that could leave the impression that Lucasfilm could not have a concern for the health or safety of the remaining twin Veronese was carrying. Put otherwise, the instruction could be interpreted as telling the jury that *any* potential hazard to an unborn child is necessarily irrelevant to the employer's legitimate decisionmaking. That cannot be, as *Johnson Controls* itself acknowledged: "It is correct to say that Title VII does not prevent the employer from having a conscience. The statute, however, does prevent sex-specific fetal-protection policies." (*Johnson Controls, supra,* 499 U.S. at p. 208.) This instruction could be interpreted as saying Lucasfilm could not have a conscience—and, inferentially at least, if it acted with one, it would violate FEHA.[13]

As Veronese's brief acknowledges, "[t]here was evidence that Patel had some concerns about the effect of stress and housing construction on Veronese's pregnancy." And indeed there was, including all the construction at the estate, the complaining neighbors, the paint fumes. All this, Patel said, caused concern for Veronese, especially in light of Patel's own miscarriages, some, she claimed, due to work stress. That notwithstanding, the import of the instruction could be that if Patel manifested a concern—however genuine, however benign—for the safety of the remaining twin that Veronese was carrying, it was per se illegal. Or, as Veronese's counsel pointblank told the jury in closing argument, it is not a "defense to pregnancy discrimination to be so caring."

It may be that the prejudicial effect of this instruction was shown by the jury verdict itself which, as noted, included findings for Lucasfilm on Veronese's claims for retaliation and failure to accommodate, claims Veronese's counsel succinctly summed up in closing argument this way:

---

[13] Government Code section 12940, subdivision (a)(1) provides as follows: "This part does not prohibit an employer from refusing to hire or discharging an employee with a physical or mental disability, or subject an employer to any legal liability resulting from the refusal to employ or the discharge of an employee with a physical or mental disability, where the employee . . . cannot perform those duties in a manner that would not endanger his or her health or safety or the health or safety of others . . . ." Lucasfilm asserts that the "instruction here contradicts that portion of FEHA." We need not decide the issue, but do note that the case did not involve an "employee's inability to perform a particular job efficiently and safely due to a physical handicap or impairment." (*McMillen v. Civil Service Com.* (1992) 6 Cal.App.4th 125, 130 [8 Cal.Rptr.2d 548].)

"Retaliation. . . . retaliation because she reported. You are doing this to me because I'm pregnant. Don't do this. The very next day she gets terminated. The very next day. And, indeed, we believe in the response letter that was literally minutes later, she was terminated. . . . [¶] . . . [¶]

"Failure to accommodate. Julie said let me come in at 11:00 o'clock. No, no, no. You stay at home. [¶] Failure to accommodate. Julie said when August 2 was—August 1 was not going to work, Julie said: Give me some hours. No, no, no. You come in on August 11. [¶] Two attempts at being accommodated that were not accommodated . . . ."

The jury rejected those claims, the latter rejection showing that the jury believed Lucasfilm's position about concern for Veronese and her pregnancy. And not without good reason, as there was much evidence of genuine concern for family and pregnant women, by both Lucasfilm in general and Patel in particular.

As to Lucasfilm, it provides its employees with paid maternity, paternity, and adoptive parent leave; adoption assistance; coverage for infertility treatment; subsidized daycare; and 100 percent medical insurance coverage for the entire family. As Bay put it, since its inception Lucasfilm has "always made some kind of arrangement to take care of the business at hand while a person was out on maternity leave."

As to Patel, there was testimony that she "is very supportive of anybody who takes maternity leave." Such testimony was provided by several witnesses, including Chris Marini, Leigh Biega, and Janice Rioseco. Marini had three children while being supervised by Patel. Biega and Rioseco worked as nannies at Parkway under Patel, and both testified that after they told Patel of their pregnancies, she was elated, supportive, and very accommodating to them throughout. Both took the full three months of maternity leave; in fact, when Biega requested another four weeks of leave, Patel agreed, saying "Take all the time you need, and then come back." Rioseco received a bonus upon returning from her maternity leave.

There was no evidence that Patel ever complained, or even expressed concern, about an employee being pregnant or taking maternity leave. Bay testified that Patel had never said anything negative to her about pregnant employees. Asked a similar question, Lucas said he had never observed any reaction by Patel regarding pregnancy "other than the fact that she loves children [and] was very helpful with pregnant women." And other than Veronese's claim here, there was no evidence that Lucasfilm or Patel was ever the subject of a complaint of pregnancy discrimination, let alone

evidence of any adverse employment action against any employee because they were pregnant, had babies, or had taken maternity leave.

*The Failure to Instruct on Failure to Prevent Discrimination Was Error*

■ Government Code section 12940, subdivision (k), prohibits an employer from failing "to take all reasonable steps necessary to prevent discrimination." As the leading California treatise states it, "This provision creates a statutory tort action with the usual tort elements (duty of care to plaintiff, breach of duty, causation and damages). [*Trujillo v. North County Transit Dist.* (1998) 63 CA4th 280, 286 [73 Cal.Rptr.2d 596].]" (Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2011) § 7.671, p. 7-109 (rev. # 1, 2011).)

As noted, Veronese's third cause of action was for "Failure to Prevent and Investigate Discrimination Violation of FEHA." As also noted, the jury found for Veronese on this cause of action. How it did so is unclear, as there was no instruction as to the required elements of the claim.

As best we can tell, it appears that Judge Taylor began to instruct about this. However, Veronese's counsel interrupted, suggesting to Judge Taylor that she was repeating an instruction already given. Though this was inaccurate, Judge Taylor stopped reading, and the jury was never instructed on the elements of the claim.

■ The trial court must instruct on the law applicable to the facts developed by the evidence and every reasonable theory that the evidence supports. (*Herbert v. Lankershim* (1937) 9 Cal.2d 409, 482 [71 P.2d 220]; *Harris v. Oaks Shopping Center* (1999) 70 Cal.App.4th 206, 208 [82 Cal.Rptr.2d 523].) As the Supreme Court has recognized, "there ordinarily is no duty to instruct in the absence of a specific request by a party; the exception is a complete failure to instruct on material issues and controlling legal principles which may amount to reversible error. [Citations.]" (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 951 [160 Cal.Rptr. 141, 603 P.2d 58], disapproved on other grounds in *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 574, fn. 4 [88 Cal.Rptr.2d 19, 981 P.2d 944].)

Witkin distills the rule this way: "[I]t is the duty of the court to see that jurors are guided on controlling legal principles, and the complete failure to instruct properly on a basic issue may be reversible error. (See *Thomas v. Buttress & McClellan* (1956) 141 CA2d 812, 819 [297 P.2d 768] [trial court should have instructed jury as to correct measure of damage on its own motion]; *Lysick v. Walcom* (1968) 258 CA2d 136, 157 [65 Cal.Rptr. 406] [trial court should have instructed jury that negligence was established as

matter of law]; *Paverud v. Niagara Machine & Tool Works* (1987) 189 CA3d 858, 863 [234 Cal.Rptr. 585] [reversible error to fail to instruct on superseding cause, which was basic defense]; [citations]." (7 Witkin, Cal. Procedure (5th ed. 2008) Trial, § 261, pp. 315–316.)

The failure to give any instruction on this claim was error.[14]

> *The Failure to Instruct Regarding the Difference Between the "Termination" Claim and the "Failure to Hire/Promote" Claim Was Error*

Lucasfilm proposed two modified CACI instructions that distinguished between the claim that Veronese was terminated from the tryout and the claim that she was not hired (or promoted) to the permanent position. They were modified CACI No. 2500, the first labeled "wrongful discharge," the second "failure to hire." Addressing these proposed instructions, counsel for Lucasfilm explained that the "wrongful discharge is from [the] temporary employment position. And the other cause of action is for failure to hire." Judge Taylor first responded that "You know something, you don't have to spell it out like that. Most of these people went to college." Pressing on, two pages later counsel for Lucasfilm reiterated that "there are, in fact, two separate claims here." This time, Judge Taylor responded, "Okay. That's fine. We can just do two separate ones for 2500. And so one is wrongful discharge. . . . Both of these need to be fixed." For some reason, the instructions were not given. This, too, was error, for the reasons stated above.

On a related issue, Lucasfilm requested instructions on the measure of damages for each claim. These proposed instructions would have told the jury that the damages for the termination from the temporary assignment were what Veronese "would have earned from her termination to the end of the temporary employment," *not* "future wages for [a] temporary position" that by its nature soon would have ended. By contrast, a proper "failure to hire/promote" instruction would have instructed what the damages would have been "from the date she would have started work in the full-time, regular position," *if* she had been selected for it over other candidates.

Judge Taylor refused those requested instructions.[15] Instead, she gave one pattern instruction, CACI No. 2433, that told the jury that Veronese's

---

[14] Veronese accurately observes that the jury verdict did answer the questions setting out the elements of this claim. Thus, any failure to give any instruction, standing alone, would undoubtedly not have been prejudicial.

[15] Judge Taylor also refused to give a mutually requested instruction pertaining to the tortious discharge claim. It was a modified version of CACI No. 2433, and stated precisely that the damages for "discharge" from the temporary assignment ended at "the end of the temporary employment [position]." Judge Taylor said that the instruction would not be given

damages were what she "would have earned up until today, including any benefits and pay increases."[16]

Lumping the two claims together suggested that the damages for both claims should be the same, which was not necessarily so. For example, even if Veronese had been discriminatorily discharged from the 30-day temporary position, it was possible that Lucasfilm would not have hired her for the permanent position. Perhaps more pointedly, the failure to differentiate between the two claims did not allow the jury to consider Lucasfilm's position that, given the "red flags" Patel saw in Veronese's August 7 e-mail, Kelly Wolfe was a more suitable candidate for the permanent position. In sum, failing to differentiate between the claims prevented the jury from considering whether, in the end, the alleged discrimination caused Veronese all of the claimed injury.

### The Errors Were Prejudicial

We recently confirmed the applicable law in *Mize-Kurman v. Marin Community College Dist., supra,* 202 Cal.App.4th at pp. 862–863: " '[T]here is no rule of automatic reversal or "inherent" prejudice applicable to any category of civil instructional error, whether of commission or omission. A judgment may not be reversed for instructional error in a civil case "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) . . .' (*Soule v. General Motors Corp.* [(1994)] 8 Cal.4th [584,] 580 [34 Cal.Rptr.2d 607, 882 P.2d 298] (*Soule*).)

". . . 'Instructional error in a civil case is prejudicial "where it seems probable" that the error "prejudicially affected the verdict." [Citations.]' (*Soule, supra,* 8 Cal.4th at p. 580; accord, *Ted Jacob Engineering Group, Inc. v. The Ratcliff Architects* [(2010)] 187 Cal.App.4th [945,] 961 [114

---

because it was *not* "CACI-fied." But CACI clearly does not cover all subjects, and the California Judges Benchbook provides guidance when it does not: "When the latest edition of the CACI does not contain an instruction on a subject on which the judge determines that the jury should be instructed, or if the instruction contained in the CACI cannot be modified to submit the issue properly, the instruction the judge gives on that subject should be accurate, brief, understandable, impartial, and free from argument. Cal Rules of Ct 2.1050(e)." (Cal. Judges Benchbook: Civil Proceedings—Trial (CJER 2010) Instructing the Jury, § 13.8, p. 118.)

[16] CACI No. 2433 is not even in the FEHA chapter, which begins with CACI No. 2500. Moreover, the instruction began by telling the jury that Veronese "claims she was discharged from employment for reasons that violate a public policy."

Cal.Rptr.3d 644].) In assessing whether a 'miscarriage of justice' has occurred, '[t]he reviewing court should consider not only the nature of the error, "including its natural and probable effect on a party's ability to place his full case before the jury," but the likelihood of actual prejudice as reflected in the individual trial record, taking into account "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled" [Citation.]' [Citations.]"

Such a miscarriage of justice occurred here.

The state of the evidence is set forth at length above. Lucasfilm presented evidence that Veronese's August 7 e-mail precipitated Patel's decision. But the jury could have reacted to Veronese's August 7 e-mail differently than did Patel, or perhaps concluded that Patel overreacted. Regardless, under the law Patel was entitled to exercise her business judgment. But the jury did not know that. Moreover, Veronese claimed that Lucasfilm retaliated for that e-mail. The jury found for Lucasfilm on this claim, that the termination was *not* motivated by retaliation. Thus, it is certainly possible that the jury credited Patel's testimony that she reacted at least in significant part to the "red flags" that the e-mail raised. Nothing in that is unlawful.

Lucasfilm's fundamental position acknowledged that it was concerned about Veronese's condition. Thus, Patel told Veronese to delay her start date until she was feeling better, telling Veronese, "The job isn't going anywhere." Lucasfilm claimed to show concern all along the way. The jury may well have concluded that Patel acted in part based on a concern for Veronese and her one remaining unborn child. But an erroneous instruction told the jury—or at least inferred—that any such concern was categorically unlawful. This could easily have influenced the jury to find pregnancy discrimination where none there was. And then possibly award the wrong amount of damages, as there was error in connection with the instruction on damages as well.

All this adds up, we conclude, to prejudice, a conclusion also supported by other factors in the record, including that the jury deliberated for three days before returning its verdict, during which time it sent no fewer than six notes to the court. Such lengthy deliberations, not to mention the notes, bear on the issue of prejudice favorably to Lucasfilm. (See *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.* (1984) 36 Cal.3d 752, 771 [206 Cal.Rptr. 354, 686 P.2d 1158], overruled on other grounds in *Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85, 88 [44 Cal.Rptr.2d 420, 900 P.2d 669].)

The "substantial factor" causation verdict was not unanimous, but 10 to two, the same as it was in *Whiteley*. This, we said, was close, and a "close verdict is a key indication that the jury was misled by an instructional error." (*Whiteley v. Philip Morris, Inc., supra,* 117 Cal.App.4th at pp. 664–665.) As a leading treatise explains in discussing whether instructional error will be held prejudicial: "If there was error in a 'close' case, the appellate court will *consider the weight of the evidence* in making its prejudicial error analysis. When appellant presented a *strong* case in the trial proceeding, the court is more likely to conclude it is 'reasonably probable' a result more favorable to appellant would have been reached without the error. [Citation.]" (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2012) § 8:301, p. 8-188 (rev. # 1, 2011).)

Finally, there was no mitigating effect from other instructions, because the jury was not given any. (See *Marich v. MGM/UA Telecommunications, Inc.* (2003) 113 Cal.App.4th 415, 429 [7 Cal.Rptr.3d 60] ["No other instructions clarified or corrected the erroneous [instructions] . . . ."].)

Superimposed on all of the above is that there were multiple errors which, as our colleagues have put it, is significant in and of itself: "Without attempting to analyze separately these issues of prejudice, we conclude that the cumulative effect of the errors was unquestionably to make it 'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error[s].' " (*Johnson v. Tosco Corp.* (1991) 1 Cal.App.4th 123, 141 [1 Cal.Rptr.2d 747]; see *Delzell v. Day* (1950) 36 Cal.2d 349, 351 [223 P.2d 625] [cumulative comments by trial court].)

In *Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 682 [36 Cal.Rptr.3d 495, 123 P.3d 931], the Supreme Court noted that instructional error will be prejudicial if it is *"reasonably probable* that instructions . . . *actually* misled the jury," and that " 'reasonable probability' in this context 'does not mean more likely than not, but merely a *reasonable chance,* more than an *abstract possibility.*' " (*Ibid.*) There was such a " 'reasonable chance' " here. The improper instructions "misled the jury and affected its verdict." (*Krouse v. Graham* (1977) 19 Cal.3d 59, 72 [137 Cal.Rptr. 863, 562 P.2d 1022].) It must be reversed.

### The Attorney Fee Award Is Premature

As noted, the trial court awarded Veronese over $1,157,000 in attorney fees under FEHA. In light of our reversal of the judgment in favor of Veronese, any award of attorney fees is premature, and the award must be vacated.

## DISPOSITION

The judgment and the order awarding attorney fees are reversed, and the matter is remanded for retrial on Veronese's claims for pregnancy discrimination, failure to prevent pregnancy discrimination, and wrongful termination in violation of public policy. Lucasfilm is awarded its costs on appeal.

Haerle, Acting P. J., and Lambden, J., concurred.

A petition for a rehearing was denied December 28, 2012, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied March 27, 2013, S208118. Baxter, J., did not participate therein.