Filed 3/13/24  McAdoo v. Wellington Property Co. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| DANA McADOO et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> WELLINGTON PROPERTY COMPANY et al., <br><br>     Defendants and Respondents. | A163856, A165895 <br><br> (Alameda County <br> Super. Ct. No. RG19010799) |

Oakland tenants Dana McAdoo and Livia Baldaccini, a married couple, brought suit against their former landlord alleging their rental home experienced toxic mold contamination and damage due to water leaks and moisture intrusion.  Following a seven-week trial, they were on balance unsuccessful.  A jury found in their favor on two of their claims (constructive eviction and breach of the implied covenant of good faith and fair dealing) but rejected their nine other claims.  It awarded them a fraction of the total damages they had sought.  The trial court subsequently awarded the defendants approximately $565,631 in attorney fees and costs pursuant to Code of Civil Procedure 998 because plaintiffs had rejected a more favorable offer of settlement prior to trial.  Offset against their damages, this award yielded a sizable monetary judgment in defendants' favor.

1

Plaintiffs appeal from both the judgment and the post-judgment award of attorney fees and costs. We reject their claims of error and will affirm both.

## BACKGROUND

In December 2015, husband and wife Dana McAdoo and Livia Baldaccini (plaintiffs) and their young daughter moved into a rental home in Oakland, California. The property was owned by Jesse Lomask ("landlord") and managed by Wellington Property Company ("Wellington" or "property manager").

Before plaintiffs' move-in, Wellington inspected the property and reported to Lomask that the carpeting in a "bonus room" under the garage had water damage because the door was "not meant to weather the elements." Lomask did not replace the carpet but hired a licensed contractor to replace the door. Neither the garage nor the bonus room are attached to the house. The contractor who performed the work testified there was no mold.

Plaintiffs claimed that shortly after they moved in they smelled a musky smell and saw mold in the kitchen, reported the situation to two Wellington employees and then cleaned the mold themselves.

About five months after moving in, on May 7, 2017, water began leaking through the ceiling from an upstairs bathroom and Wellington sent in a third-party repair team. Plaintiffs claimed that one of the third-party service workers hired by Wellington found mold in the wall of the master bedroom and said he would inform Wellington.

About seven months later, with no follow-up from Wellington about the mold supposedly detected in the master bedroom, plaintiffs renewed their lease, in December 2017.

About a month later, on January 21, 2018, the washing machine malfunctioned and flooded the upstairs and downstairs levels of the home, causing extensive water damage.

The property manager sent a remediation company, Servicemaster, out to the home the next day, and plaintiffs moved to a hotel for about three weeks while the water damage was repaired. They submitted a claim under their renters' insurance policy for their expenses.

The water damage was remediated but no mold testing was undertaken. A representative for the company that did the remediation work indicated on an initial inspection form that mold testing was needed but also testified there was no visible mold when the work was carried out.

Baldacinni testified that she visited the home while the remediation work was underway and saw mold. She took photographs and reported her mold concerns to Christine de Asis, a claims adjuster for Farmer's Insurance who was plaintiffs' point of contact for their renters insurance claim. De Asis also was the claims adjuster for Lomask and Wellington on their claim under their own Farmer's Insurance policy for the washing machine leak. The parties thus stipulated that de Asis was an agent of both plaintiffs and defendants.

De Asis acknowledged at trial that Baldaccini said she thought there was mold, could not recall mentioning mold to Lomask but did tell him plaintiffs didn't feel safe staying in the home. She testified Lomask told her he felt the same way about it being unsafe and instructed her to contact Wellington, and then she told Wellington there was a "possible mold issue" and it wasn't safe for plaintiffs to remain in the home.

De Asis also emailed Farmers Insurance on January 30, 2018, telling Farmers plaintiffs didn't feel comfortable staying in the home and also

3

mentioned there *was* mold in the home and it was unsafe.  She testified she wrote the email because Baldaccini was frustrated and just wrote what Baldaccini had told her to write.  She testified, "I was trying to represent the client as helpful as I could be, and I think she was very frustrated at that time.  And so, of course, as an agent,  . . . I go by what the client says and see if I can make their . . . claims experience . . . be better . . . ."  She hadn't visited the home herself and testified she would defer to ServiceMaster as to whether mold was actually present after the washing machine leak because they were the experts.

There was a factual dispute as to whether Baldaccini also told Wellington employee Ted Kearns about having seen mold in the home during this period.

Plaintiffs moved back to the home on February 15, 2018.

Plaintiffs testified they told two Wellington employees they were concerned there was still mold in the home when they moved back in; the employees disputed they were told this.

About seven months later, in September 2018, Wellington hired a third-party service provider to do a moisture inspection and moisture was detected.  Servicemaster, the company that had performed the water damage remediation from the washing machine leak, also inspected the home but found no moisture and no mold.  Servicemaster's inspector (Barbara "Jean" Hughes) could not even smell anything resembling mold ("Q: Did you smell any musky or moldy odor?  A. No.  And I am an odor specialist.  I can smell a fly fart.")

Plaintiffs testified that sometime in late September, after Servicemaster told them no moisture was found, they decided they would not renew their lease when it came up for renewal in December.

4

After that, they hired their own mold expert, Jim Koniuto, who inspected the home in October 2018 and found visible mold and elevated mold levels in the air throughout the home. He opined this was due to the washing machine leak, moisture penetration through a wall of the master bedroom,[1] and a stained bedroom carpet that had never been replaced. The inspector urged plaintiffs to move out of the home immediately, and they did so on October 1, 2018. But there was evidence that Koniuto's testing and inspection methods failed to follow industry standards in several respects, including by engaging in destructive testing that a defense expert concluded had contaminated the entire home with mold.

There was also evidence that, by this time, plaintiffs already had been planning to move to San Jose, and were just exploiting the situation to manufacture a claim for wrongful eviction. For example, they told their doctor on October 1, 2018, they were moving to a new house in December. By October 9, they had picked out a school for their child in San Jose and had been pre-approved for a $2 million mortgage.

After plaintiffs' self-funded mold inspection conducted by Koniuto, Wellington hired its own inspector, Jason Hibsch of Safe Air Fast Environmental Testing and Consulting Services ("SAFE"), who found even higher levels of mold in the home than Koniuto had found, following Koniuto's destructive testing.

After these two mold inspections, Wellington employee Anabel Ramirez had a phone call with McAdoo on October 10, 2018. McAdoo testified he was

_____

[1] Plaintiffs hired a construction expert who concluded that mold in the bedroom was due to the home's location on a hillside and recommended installing a drain below a portion of the foundation.

told that Wellington was terminating their lease; Ramirez denied this and testified that *McAdoo* told her plaintiffs did not want to go back in the house, did not want to relocate or make further arrangements to wait for the work to be done, but wanted to be done with the tenancy. Ramirez's "understanding of our conversation was that it was a mutual understanding, and that we'd be letting them out of their lease."

Plaintiffs stayed in a hotel briefly and then bought a home in San Jose.

Virtually every aspect of this case was hotly contested. In addition to the conflicts noted above, some of the major points of dispute were the following:

Most central was the question as to whether any significant mold had been present before the destructive testing undertaken by plaintiffs' expert. The parties' experts disputed whether there had ever been any significant amounts of mold in the home apart from some concealed behind baseboards and fixtures in the master bathroom. And there were many subsidiary factual disputes bearing on that ultimate question, including whether there was any visible mold in the home after the washing machine leak in January 2018, with Baldacinni having testified she saw mold while the remediation was underway and Servicemaster having seen none.

There were also issues bearing on the veracity of plaintiffs' claims they saw mold and the appropriateness of defendants' response to their concerns. For example, plaintiffs never formally complained in writing to Wellington about mold or asked for a mold test, and there was evidence that had they done so Wellington would have complied. The parties also presented sharply conflicting expert testimony about the adequacy of Wellington's response to the situation, including the adequacy of the remediation work it coordinated

6

and the appropriateness of how it dealt with the plaintiffs personally as the concerns came to light.

In addition, plaintiffs claimed they suffered respiratory and other health issues caused by the mold and water issues, and that too was disputed. Plaintiffs presented expert testimony to substantiate their health claims. Yet the first time Baldaccini ever complained to her doctor about mold was on October 5, 2018, four days after vacating the home and *eight months* after she told de Asis she'd seen mold during the remediation work (in January 2018). On October 5, she got a letter from her doctor "To whomever this may concern" stating "It would be unsafe for this patient to live in a mold environment. She cannot move in until it is proven all mold has been removed from the property." At trial, her treating physician testified there was no indication that her current respiratory issues had been caused by any mold exposure from that time period. He testified he wrote that letter at her request and would never do such a thing again for another patient. And her physician testified that by October 2018, Baldaccini had resumed smoking. Defendants' theory was that, by this time, plaintiffs had already hired counsel and were manufacturing a paper trail for litigation.

Plaintiffs then filed suit and, as we've said, largely lost. As summarized by the trial court in its attorney fees ruling:

"On March 13, 2019, Dana McAdoo and Livia Baldaccini ('[p]laintiffs') asserted wrongful eviction and related claims against Jesse Lomask and Wellington Properties Co. ('Defendants') based on allegations of mold infestation, water intrusion, and other matters in connection with property located at 6206 Valley View Road, Oakland.

"The central allegations in the Complaint that underlie all eleven causes of action are as follows: Plaintiffs, with their minor, rented a

7

residence from Defendants.  The property was infested with mildew and mold.  Water intruded from the upstairs bathroom, causing damage and other habitability issues.  Plaintiffs complained, but Defendants failed to cure the problems.  The Plaintiffs and their minor suffered respiratory and other health issues caused by the mold and water issues.  Plaintiffs were forced to vacate temporarily.  They returned, but Defendants still failed to cure the problems, which forced Plaintiffs to evacuate permanently.

"On September 18, 2019, Defendants served two Offers to Compromise pursuant to Code of Civil Procedure § 998, one on Mr. [McAdoo] and one on Ms. Baldaccini. . . . The offers included 'paying [each] Plaintiff the total sum of Forty Thousand Dollars, ($40,000), plus Plaintiffs' Code of Civil Procedure § 1033.5 costs and reasonably incurred attorneys' fees incurred to date.'  Later, after a mandatory settlement conference, Plaintiffs served a [section] 998 Offer to Compromise on Defendants for $550,000.  Following a case management conference in February 2021, Plaintiffs dismissed . . . claims [asserted by their minor child] with an agreement that each side bear their own costs and attorneys' fees with respect to [those] claims.  A few days before trial, on or about March 16, 2021, Plaintiffs dismissed their claim under Civil Code § 1942.4 for the wrongful collection of rent without any agreement on fees or costs as to that claim.

"The matter proceeded to a seven-week jury trial beginning on April 19, 2021, the Hon. Stephen Pulido presiding.  On June 10, 2021, the jury rendered a verdict.  The jury found for Plaintiffs and against Defendants on the following causes of action:  Constructive Eviction; and Breach of the Implied Covenant of Good Faith and Fair Dealing.  The jury found for Defendants on the following causes of action:  Violation of Oakland Municipal Code ('OMC') 8.22.360 Good Cause for Eviction; Violation of OMC 8.22.640

8

Tenant Harassment; Wrongful Eviction - Common Law; Retaliatory Eviction—Civil Code 1942.5; Breach of Contract; Breach of the Implied Warranty of Habitability; Breach of the Covenant of Quiet Enjoyment; Negligence; and Negligence Per Se. The jury granted Plaintiffs, 'jointly and severally,' economic damages in the amount of $49,325.56. In addition, Mr. McAdoo and Ms. Baldaccini recovered $1,000.00 and $3,933.00 in non-economic damages respectively. Plaintiffs did not prevail on any claim that entitled Plaintiffs to an award of attorneys' fees. On August 20, 2021, the Court entered a Judgment After Verdict, striking proposed language identifying Plaintiffs as the prevailing party."

In total, plaintiffs recovered $54,258 in damages, after having asked the jury to award them nearly $610,000. With the potential for treble damages under local law, defendants had faced the prospect at trial of suffering an approximately $1.8 million damages award.

After the jury's verdict, plaintiffs moved for judgment notwithstanding the verdict or, in the alternative, for a new trial, both of which the trial court denied.

Defendants moved pursuant to Civil Code section 998, for an award of attorney fees and costs, which the trial court granted, in the amount of $565,087. As amended to reflect the award of attorney fees and costs, judgment was entered in favor of defendants and against plaintiffs for the principal amount of $510,828.54 (the fee award minus the verdict rendered for plaintiffs).

Plaintiffs timely appealed from both the judgment and the post-judgment order awarding attorney fees and costs.

9

# DISUSSION

Plaintiffs assert numerous issues.  In challenging the judgment, they raise several claims of instructional error; argue that defendants' attorney made improper remarks during arguments to the jury; and raise two evidentiary issues.  In their appeal from the award of attorney fees and costs, they challenge only the amount of fees and costs awarded as excessive and do not contest defendants' entitlement to an award.[2]

" 'In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' " (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 146.)  "Mere suggestions of error without supporting argument or authority other than general abstract principles do not properly present grounds for appellate review." (*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1066, 1078.)  Likewise, it is not sufficient simply to cite legal authority without explaining how it applies.  (*Doe v. McLaughlin* (2022) 83 Cal.App.5th 640, 654; *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.)  Appellate courts are not required to "guess" how an appellant thinks the trial court erred.  (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 869.)  An appellant must "convince us, by developing his arguments, stating the law, and calling out relevant portions of the record, that the trial court committed reversible error," and the failure to do so justifies us in rejecting the appellant's arguments on this basis alone.

---

[2]  Plaintiffs do contend the award of fees and costs should be reversed if we reverse the judgment.  Because we are affirming the judgment, however, that contention is moot.

10

(*Bishop v. The Bishop's School* (2022) 86 Cal.App.5th 893, 910; accord, *Lafayette Morehouse,* at p. 869.)

We also do not entertain arguments presented in a scattershot or disorganized fashion. Each point raised must be identified by an argument heading so that we are " ' "advised, as [we] read, of the exact question under consideration, instead of being compelled to extricate it from the mass." ' " (*United Grand, supra*, 36 Cal.App.5th at p. 153.) We disregard stray arguments that are woven into the briefing not appropriately identified under an argument heading and presented as distinct arguments for reversal. (See, e.g., *Tsakopoulos Investments, LLC v. County of Sacramento* (2023) 95 Cal.App.5th 280, 309-310.) " 'Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading.' " (*Id.* at p. 310.)

## I.

### *Jury Instructions*

Plaintiffs challenge the jury instructions on multiple grounds. We begin with the legal principles that govern our consideration of these issues, mostly ignored by plaintiffs in application.

First, a claim of instructional error must be preserved for our review. All instructions that are claimed to be legally incorrect are deemed automatically objected to. (See Code Civ. Proc., § 647; *Maureen K. v. Tuschka* (2013) 215 Cal.App.4th 519, 530.) All other claims of instructional error, however, must have been brought to the trial court's attention. Where the court " ' "gives an instruction correct in law, but the party complains that it is too general, lacks clarity, or is incomplete, he must request *the additional or qualifying instruction in order to have the error reviewed.*" ' " (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1131.) Likewise, a party

11

cannot challenge the court's failure to give an instruction unless the party *requested* such an instruction. (See, e.g., *Martinez v. Rite Aid Corp.* (2021) 63 Cal.App.5th 958, 972, fn. 4 [issue held forfeited].) " ' " 'In a civil case, each of the parties must propose complete and comprehensive instructions in accordance with his theory of the litigation; if the parties do not do so, the court has no duty to instruct on its own motion.' " ' " (*Metcalf*, at pp. 1130-1131.)

Second, assuming the claim of instructional error was properly preserved, the appellant must demonstrate an error in the instructions. Pursuant to the general principles of appellate law we have already discussed, this requires an appellant to present a coherent discussion and analysis of both the relevant substantive law and the principles governing our review of a claim of instructional error. We review a claim of instructional error de novo. (*Collins v. County of San Diego* (2021) 60 Cal.App.5th 1035, 1055). "The trial court's 'duty to instruct the jury is discharged if its instructions embrace all points of law necessary to a decision.' [Citation.] 'A party is not entitled to have the jury instructed in any particular fashion or phraseology, and may not complain if the court correctly gives the substance of the applicable law.' [Citation.]" (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82.) Further, as plaintiffs acknowledge, "[w]hen a party challenges a particular jury instruction as being incorrect or incomplete, 'we evaluate the instructions given as a whole, not in isolation.' " (*Ibid.*)

Finally, the appellant must show that the instructional error was prejudicial. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 (*Soule*)). "[T]here is no rule of automatic reversal or 'inherent' prejudice applicable to any category of civil instructional error, whether of commission or omission.

12

A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' [Citation.] . . . [¶] Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' " (*Ibid.*; see also *People v. Watson* (1956) 46 Cal.2d 818, 836.) "Insofar as relevant, courts should consider (1) the degree of conflict in the evidence on the critical issues; (2) whether the winning side's argument to the jury may have contributed to the instruction's misleading effect; (3) whether the jury requested rereading of the erroneous instruction or related evidence; (4) the closeness of the jury's verdict; and (5) the effect of other instructions in remedying the error." (*Bader v. Johnson & Johnson* (2022) 86 Cal.App.5th 1094, 1131-1132.) In assessing prejudice under the *Soule* factors, " ' "[W]e do not view the evidence in the light most favorable to the successful [party] and draw all inferences in favor of the judgment. Rather, we must assume that the jury, had it been given proper instructions, might have drawn different inferences more favorable to the losing [party] and rendered a verdict in [that party's] favor on those issues as to which it was misdirected. [Citations.]" ' " (*Veronese v. Lucasfilm Ltd.* (2012) 212 Cal.App.4th 1, 4-5 (*Veronese*).)

### A. Failure to Instruct on Constructive Eviction Under Oakland's Just Cause for Eviction Ordinance

Plaintiffs first challenge the court's instructions concerning Oakland's Just Cause For Eviction Ordinance, contending in substance they were incomplete because the court refused to include additional language they proposed.

The ordinance prohibits landlords from "endeavor[ing] to recover possession, issu[ing] a notice terminating tenancy, or recover[ing] possession of a rental unit in the city of Oakland" unless the landlord proves the existence of one of 11 enumerated grounds. (Oakland Mun. Code, § 8.22.360) Its stated purpose is to "protect[] tenants against arbitrary, unreasonable, discriminatory, or retaliatory evictions . . . ." (*Id.*, § 8.22.330.)

Plaintiffs proposed the following instruction on this issue, which the trial court gave as requested (with immaterial changes not pertinent here) except it refused the italicized portion:

**"SPECIAL JURY INSTRUCTION NO. 2[:] [¶] VIOLATION OF THE JUST CAUSE FOR EVICTION ORDINANCE [¶] Oakland Municipal Code § 8.22.360**

"A landlord can only endeavor to recover possession of a rental unit if the landlord serve[s] a written notice terminating the tenancy and if the landlord can prove they recovered it for any of the following grounds:

"1. Plaintiffs failed to pay rent;

"2. Plaintiffs violated a material term of their Lease;

"3. Plaintiffs willfully caused substantial damage to the Property beyond normal wear and tear;

"or

"4. Defendants sought in good faith to undertake substantial repairs that cannot be completed while the unit is occupied.

"*Wrongful recovery of a rental property may include the owner or landlord's failure to exercise due diligence and timely repair, failure to complete the repair, or failure to follow appropriate industry repair or containment or minimizing exposure to mold.*" (Italics added.)

14

Plaintiffs assert the court prejudicially erred by refusing its requested additional language addressing the failure to make repairs, because constructive eviction constitutes a violation of the ordinance as a matter of law. They argue the error was prejudicial because the jury found that they had been constructively evicted pursuant to their common law claim. Therefore, they assert, had the jury been properly instructed with the above italicized language it is likely the jury would have found that defendants violated the ordinance.

Plaintiffs have not demonstrated any error in the instructions. They cite dicta stating that "[o]n [its] face" Oakland's Just Cause For Eviction ordinance creates liability for a range of conduct including "constructive eviction by failure to provide heat." (*Rental Housing Assn. of Northern Alameda County v. City of Oakland* (2009) 171 Cal.App.4th 741, 767 (*Rental Housing*).) But the case did not concern the ordinance's substantive scope or examine its text. It upheld the validity of the ordinance against facial challenges under the litigation privilege and the constitutional right of access to the courts. (See *id.* at pp. 766-769.)

Furthermore, assuming without deciding that the ordinance does create liability for "constructive eviction" (*Rental Housing, supra,* 171 Cal.App.4th at p. 767), the cited authority does not discuss what that entails, much less address how a jury should be instructed on the subject, and plaintiffs do not elaborate by way of any further legal analysis or argument. They simply assume—and ask us likewise to assume—that their proposed instruction correctly states the law of constructive eviction as incorporated by the Oakland ordinance.

Finally, substantive law aside, the form of the instruction plaintiffs proposed was improper because it was unduly argumentative. That is, it was

15

tailored to the plaintiffs' precise theory of the facts. Plaintiffs thus have not persuaded us their requested instruction should have been given. (See *Dodge v. San Diego Elec. Ry. Co.* (1949) 92 Cal.App.2d 759, 763 [rejecting claim of error in rejecting instructions proffered by plaintiffs that "unduly emphasized plaintiff's theory of the case"]; see also Cal. Rules of Court, rule 2.1050(f) [when Judicial Council instructions do not contain instruction on subject on which trial court determines jury should be instructed, instruction given on that subject should be accurate, brief, understandable, impartial, free from argument].) As the court stated in *Dodge*, "Instructions should not draw the jury's attention to particular facts. It is error to give and proper to refuse an instruction that unduly overemphasizes issues, theories or defenses either by repetition or by singling them out or making them unduly prominent although the instruction may be a legal proposition." (*Dodge,* at p. 764; accord, *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1217 [" 'Instructions should state rules of law in general terms and should not be calculated to amount to an argument to the jury in the guise of a statement of law' "]; *Boeken v. Phillip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1678.)

## B. Instructions Concerning a Principal's Imputed Knowledge of Facts Known to an Agent

Plaintiffs' second claim of instructional error is that the court initially gave a *correct* instruction telling the jury that the landlord (Lomask) was deemed to have knowledge of all facts that were known by his agent (Christine de Asis) but then retracted the instruction and instructed the jury with a modified version limiting the landlord's imputed knowledge to all facts known by the agent that " 'ought to have been, in good faith, and [in] the exercise of ordinary care and diligence, communicated' " to the landlord. They assert the second instruction was legally incorrect because the agent,

16

who was aware of plaintiffs' mold concerns, had a legal duty to inform the landlord of that information and her knowledge was imputed to him as a matter of law. They assert that the initial instruction the court agreed to give was correct and should not have been modified.

Plaintiffs have demonstrated no error. First, the instructional language the court added to which they now object tracks the very language of the statute they say applies. The court instructed the jury that Lomask " 'is deemed to have knowledge of all facts that you determine were within Christine de Asis' knowledge *and ought to have been, in good faith, and the exercise of ordinary care and diligence, communicated to Jesse Lomask.*' " (Italics added.) This instruction precisely tracks the language of Civil Code section 2332, which plaintiffs quote in the very first sentence of their argument as the controlling legal standard. They do not cite or discuss any authority holding, or even suggesting, a plausible claim of instructional error predicated on the inclusion of this language in an instruction to the jury. The imputed knowledge cases they cite do not address instructional issues, nor are they even factually similar.[3] (See *General Star Indemnity Company v. Thunderbutte Enterprises, LLC* (E.D. Cal. 2016) 221 F.Supp.3d 1174, 1183; *Tsasu LLC v. U.S. Bank Trust, N.A.* (2021) 62 Cal.App.5th 704, 723-724).

_____

[3] Plaintiffs also cite, but do not discuss or analyze, Insurance Code section 332 and inapposite federal authority applying that statute (*Merchants Fire Assur. Corp. v. Lattimore* (9th Cir. 1959) 263 F.2d 232, 239-240), which states: "Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining." (Ins. Code, § 332.) Plaintiffs fail to explain how this statute supports an instruction that all of de Asis' knowledge, including that learned from other insureds, is by law imputed to Lomask.

17

Second, and of even greater consequence, plaintiffs have not demonstrated they were entitled to an instruction that Lomask is automatically deemed to have knowledge of *any* facts within de Asis's knowledge. As respondents point out, even the original, unmodified instruction that plaintiffs argue should have been given misstates the law in the circumstances of this case.[4]

Imputed knowledge is not an all-or-nothing principle that depends on the mere existence of an agency relationship. For example, a principal is not imputed with knowledge of information an agent obtained *before* the agency relationship existed. (See *Costa v. Road Runner Sports, Inc.* (2022) 84 Cal.App.5th 224, 235 [citing authorities].) And under caselaw cited by respondents, an agent's knowledge is not imputed to a principal *if the agent was not acting as the principal's agent when they learned the information.* (See *RSB Vineyards, LLC v. Orsi* (2017) 15 Cal.App.5th 1089, 1101 (*RSB Vineyards, LLC*) [knowledge acquired by construction professionals about building defects not imputed to defendants because assuming they were defendants' agents for some purposes their knowledge was not acquired while acting in that capacity].)

Only " 'knowledge acquired by an agent *during the agency and within its scope* is imputed to the principal' " (*Maron v. Swig* (1952) 115 Cal.App.2d 87, 90, italics added), and such issues can be factual ones for a jury to resolve. (See *id.* at p. 91 [evidence "demonstrate[d] that the extent and character of [individual's] authority and agency was not clear cut and was therefore a

---

[4] Respondents assert the modified instruction was no better than the initial version and would have given *them* grounds to appeal.

18

matter for the jury's determination" for purposes of deciding if building superintendent's knowledge of thefts could be imputed to building owner].)

Here, there at least appears to be a factual issue as to whether de Asis was acting as Lomask's agent when Baldiccini complained to her about possible mold while the water damage from the washing machine leak was underway. Baldiccini testified she called de Asis "because I knew that she was the agent for the house, and she had told us . . . that she has had communication with [landlord], and "I . . . assumed that . . . by her getting this information that it would get back to the owner . . . ." But, as noted, de Asis testified she was being responsive to *Baldaccini's* concerns as a client of Farmers Insurance when she had the conversations about mold now at issue. There may well be additional evidence from which a jury could infer she was acting on behalf of plaintiffs, not Lomask, when she learned Baldaccini thought that mold was present in the home. We do not know, however, because this issue is completely unaddressed by plaintiffs in their briefing.

Plaintiffs do not analyze or even address these principles of agency law including, most critically, *RSB Vineyards, LLC* cited by respondents. They have not discussed any and all evidence bearing on which hat de Asis was wearing at the time she gained this information, much less addressed its legal significance. For these reasons, they have failed to persuade us that the initial instruction they proposed was correct.

Plaintiffs also have not demonstrated that any error in refusing to give that instruction was prejudicial. In their opening brief, they argue that "the jury likely found Lomask was not aware of the mold issue solely because de Asis did not specifically communicate that to him and the jury was *not sure* whether de Asis was required to do so." Had the jury been properly instructed, they assert, "it is likely the jury would have reached a different

conclusion and found that Lomask was aware of mold" at the property since January 30, 2018, and "[t]hat would have led to a different outcome on most, if not all, of the claims asserted by [Plaintiffs]."

Those conclusory points fall far short of what is required to demonstrate prejudice under the *Soule* factors that govern a claim of instructional error. (See *Soule, supra*, 8 Cal.4th 548.)

To begin, plaintiffs do not analyze each cause of action separately and demonstrate in what respect the claimed instructional error tainted the jury's verdict.

Further, their prejudice-across-the-board argument, such as it is, is incomplete. All they do is address some of the evidence (and even then, we cannot tell if it is a full and fair summary). But they do not make any attempt to analyze "the effect of other instructions, . . . the effect of counsel's arguments, and . . . any indications by the jury itself that it was misled." (*Soule, supra*, 8 Cal.4th at pp. 580-581.)

That is not a proper prejudice argument. Our duty to examine the record to evaluate whether an instructional error is prejudicial under the *Soule* factors "is triggered 'when and only when the appellant has fulfilled his duty to tender a proper prejudice argument. Because of the need to consider the particulars of the given case, rather than the type of error, the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice.' [Citation.] These principles are derived from the axiom that prejudice is not presumed and the burden is on the appealing party to demonstrate that prejudice has occurred." (*Adams v. MHC Colony Park, L.P.* (2014) 224 Cal.App.4th 601, 614 (*Adams*).) " 'Where any error is relied on for a reversal it is not sufficient for appellant to point to the error and rest there.' " (*Paterno v. State of California* (1999) 74 Cal.App.4th 68,

20

106; accord, *DiRaffael v. California Army National Guard* (2019) 35 Cal.App.5th 692, 718.) By failing to analyze the *Soule* factors and making only a conclusory assertion of prejudice, plaintiffs have failed to carry their burden of affirmatively demonstrating the existence of a prejudicial instructional error. (*Adams*, at p. 615.)

Their reply brief arguments fare no better. Apart from repeating the conclusory points made before, they assert that because the instruction is legally incorrect, we must assume that a properly instructed jury would have rendered a verdict in its favor under this court's opinion in *Veronese, supra,* 212 Cal.App.4th 1.

That misconstrues *Veronese*. We did not *presume* prejudice from instructional error in that case. On the contrary, we expressly said that prejudice is not presumed, and extensively discussed and applied the *Soule* factors. (*Veronese, supra,* 212 Cal.App.4th at pp. 30-32.) In discussing the state of the evidence, we evaluated the evidence most favorably to the appealing party (see *id*. at pp. 30-31) consistent with the principle that, in evaluating a claim of instructional error, we must assume the jury might have believed the appellant's version of the facts (*id*. at pp. 4-5). But nothing in *Veronese* eliminates plaintiffs' burden as the appellants to make a proper demonstration of prejudicial instructional error under all of the *Soule* factors.

They have failed to do so.

### C. Instructions Concerning Warranty of Habitability

We reject plaintiffs' next claim of instructional error for the same reason. They assert that the instruction defining the elements of breach of the warranty of habitability contained a substantial amount of irrelevant language that had no application to the facts, and therefore the jury likely

21

would have reached a different result had the irrelevant language been excised from that instruction.

Here again, however, plaintiffs have made no cognizable prejudice argument. They assert in a single, conclusory paragraph that the instruction "likely confused the jury," the jury "likely overlooked the fact that" defendants' actions "would be sufficient" to support liability, and the jury "likely would have reached a different result" had the instruction not included the extraneous information. By failing to analyze the *Soule* factors and making only a conclusory assertion of prejudice, plaintiffs have failed to carry their burden of affirmatively demonstrating the existence of a prejudicial instructional error. (*Adams*, *supra*, 224 Cal.App.4th at p. 615.)

Plaintiffs make a new argument in their reply brief that the instruction on this cause of action misstates the law. That issue is forfeited. " 'It is elementary that points raised for the first time in a reply brief are not considered by the court.' " (*Herrera v. Doctors Medical Center of Modesto* (2021) 67 Cal.App.5th 538, 548 (*Herrera*).)

## D. Comparative Fault Instructions

Finally, plaintiffs assert the court prejudicially erred by improperly instructing the jury concerning negligence, negligence per se, comparative fault and apportionment of responsibility. Specifically, they assert that the instructions concerning comparative fault and apportionment of responsibility were not "clearly" limited to just the negligence cause of action and should have told the jury it "did not need to apportion fault" if it did not find defendants liable for negligence.[5]

---

[5] The instructions on comparative fault told the jury to determine whether, and the extent to which, plaintiffs' own negligence contributed to

22

Any error was invited, and therefore we will not consider this claim. The comparative fault instructions plaintiffs attack (CACI Nos. 405-406) were *jointly proposed*. Parties cannot urge reversal of a judgment based on erroneous instructions they requested. (See *Burch v. CertainTeed Corporation* (2019) 34 Cal.App.5th 341, 350-351.)

Further, had the error not been invited it would have been forfeited. The claim here is not that the comparative fault instruction was legally incorrect as given; it is that the instruction was not sufficiently qualified. To preserve that claim of error plaintiffs had to ask for the instruction they now say was warranted. "It is settled that a party may not complain on appeal that an instruction correct in law is too general or incomplete unless he had requested an additional or qualifying instruction." (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 948 [error held forfeited], disapproved on another ground, *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 574, fn. 4.) Yet plaintiffs make no attempt to demonstrate that they did so.[6]

their "harm." The jury was instructed that the court itself would calculate the amount by which plaintiffs' "damages" would be accordingly reduced.

[6] The only "objection" they say they raised to the assertedly faulty comparative fault instruction is accompanied by record citations to some *post-trial* briefing *by defendants* on the issue of comparative fault and to the caption pages of the opening and reply memoranda of points and authorities in support of plaintiff's post-trial motion for a new trial and JNOV. Neither is a proper substitute for the requested clarifying instruction required to preserve this issue. Furthermore, plaintiffs' post-trial new trial/JNOV motion did not even argue instructional error. It just asserted that the evidence justified a verdict in their favor on the negligence claim as a matter of law. In the alternative, it sought a new trial on the grounds that there was insufficient evidence to support the verdict that defendants were not negligent, and that the jury's comparative fault verdict was inconsistent with the no negligence finding.

Plaintiffs also make no cognizable claim of prejudice. Not only do they make no attempt to address and apply the *Soule* factors. From even a cursory glance at this record, it also is obvious any error was harmless. As respondents point out, although the jury apportioned 20 percent of fault to each of the two plaintiffs, the court received post-verdict briefing as to whether their comparative fault could be applied to reduce the damages the jury assessed for constructive eviction and it agreed with the plaintiffs they could not. The court *declined* to reduce the jury's award of constructive eviction damages for plaintiffs' comparative fault. Any error in allowing the jury to assess comparative fault for claims other than negligence had no impact on the actual result.

Finally, scattered within this argument section are additional contentions: claims that the jury rendered an inconsistent verdict, the special verdict form was faulty and that the jury's finding defendants were not negligent is not supported by substantial evidence. We do not consider those points. " 'Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading.' " (*Herrera*, *supra*, 67 Cal.App.5th at p. 547.)

## II.

### *Arguments by Defense Counsel*

As noted, plaintiffs assert that defense counsel made improper remarks during arguments to the jury, on multiple subjects.

First, they contend defense counsel misstated the law during closing arguments by stating that the cause of action for violation of Oakland's Just Cause For Eviction Ordinance "is not about plaintiffs moving out on October 1st. That's something different. That's constructive eviction." They

also assert that defense counsel improperly argued that liability for that cause of action would have "severe consequences."

Both claims are forfeited. As plaintiffs acknowledge, to preserve a claim of prejudicial misconduct during closing arguments, a litigant must timely object and also request the jury be admonished to disregard the improper argument. (See, e.g., *Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 303 [claim of improper argument held forfeited]; *Elsworth v. Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 552-553 [same].) Plaintiffs did neither. The record reflects that plaintiffs' counsel remained silent when the challenged comments were made. By doing so, he forfeited plaintiffs' right to challenge the remarks as improper. (*Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 200.)

Plaintiffs' only attempt to show these issues were preserved for our review (unsupported by citation to any legal authority) is unpersuasive. They assert only that they objected to the alleged misstatement of law regarding constructive eviction but make no attempt to show they also objected to the "severe consequences" comments. And even that limited assertion mischaracterizes the record. The objection they cite came many pages after all of the comments they now say were improper and was directed at defense counsel's comment that the tenant harassment claim "is what you think it is. It's when a landlord is abusing a tenant, and those—" Plaintiffs' counsel interrupted and objected, "Misstates the law." The objection had nothing to do with the arguments plaintiffs now challenge on appeal.

Second, plaintiffs argue that during opening statements and then again during closing arguments, defense counsel improperly made a number of statements that improperly accused plaintiffs' counsel of "directing traffic" for them and manufacturing this entire dispute. They quote numerous portions

25

of defense counsel's statements that they say were improper and concede that they "did not raise an objection to each and every specific instance" of alleged misconduct.

Assuming without deciding these claims were nonetheless preserved for our review as plaintiffs contend, plaintiffs have demonstrated no error. This argument contains no discussion of any law, and rests only on the single, unsupported assertion that the multiple challenged comments "arguably violated the attorney-client privilege and certainly violated public policy." That is inadequate to meet plaintiffs' burden of demonstrating error on appeal.

## III.

### *Evidentiary Issues*

Finally, plaintiffs challenge two evidentiary rulings as an abuse of discretion.

First, they contend the trial court erroneously allowed defense counsel to cross-examine one of their expert witnesses about unflattering Yelp reviews of his company while disallowing them from cross-examining a defense witness about unflattering Yelp reviews of the defense witness's company.

Plaintiffs have failed to present a cognizable appellate argument on this issue. Their discussion of the Yelp reviews issue contains *no* legal or factual analysis concerning the asserted error and does not even address the subject of prejudice. It warrants no discussion.

Second, plaintiffs contend the court improperly prevented them from impeaching a defense witness who testified that the property did not need a new drainage system with a prior inconsistent statement he had made in an email indicating the drainage system *was* inadequate and had failed. It is

unnecessary to consider whether the court erred in excluding the impeaching email from evidence because plaintiffs have not demonstrated they were prejudiced by the ruling.

When challenging an evidentiary ruling, an appellant must do more than show the trial court erred. "A court's error in excluding evidence is grounds for reversal only if the appellant demonstrates a miscarriage of justice, that is, that a different result would have been probable had the error not occurred." (*Major v. R.J. Reynolds Tobacco Co.* (2017) 14 Cal.App.5th 1179, 1202; see also *Zhou v. Unisource Worldwide, Inc.* (2007) 157 Cal.App.4th 1471, 1480; Cal. Const., art. VI, § 13; Evid. Code, § 354; Code Civ. Proc., § 475.)

Plaintiffs have not demonstrated a different result would have been probable but for this ruling. They merely assert—in all of one sentence—that as a result of their inability to impeach this particular witness, "the jury was led to believe that the Subject Property's drainage system was functional after Appellants had vacated it, even though [the witness] really concluded that it had failed."

Once again, that is not a proper prejudice argument. As the trial court put it when ruling post-trial on attorney fees and costs, "Trial lasted seven weeks, involved 22 witnesses, including 12 experts, and many exhibits." The appendix contains nearly 600 pages of trial exhibits and the reporter's transcript is more than 4,000 pages. Plaintiffs' effort to suggest they were prejudiced is a totally undeveloped point presented in a vacuum, devoid of any discussion of the law, the issues, the evidence or even the jury's verdict. It falls far short of meeting their burden to " 'spell[ ] out in [their] brief exactly how the error caused a miscarriage of justice.' " (*Adams*, *supra*, 224 Cal.App.4th at p. 614.)

27

## IV.

### *Attorney Fees and Costs*

Prior to trial, defendants made an offer to compromise under Code of Civil Procedure section 998 that was more favorable than the verdict plaintiffs ultimately obtained, which the trial court ruled entitled defendants to recover their post-offer costs including attorney fees. As noted, on appeal plaintiffs do not challenge the court's ruling on the issue of entitlement.

After the jury returned its verdict, defendants filed a motion requesting $1,880,735 in attorney fees. The trial court ruled that $1,620,375 had been reasonably incurred, setting that figure as the recoverable lodestar amount. But in light of plaintiffs' financial circumstances and claimed inability to pay, it reduced the $1.6 million by nearly $1.2 million and awarded only $450,000. The court found that plaintiffs have the ability to pay that significantly reduced amount, and that it represented an amount that "enforces the policy behind § 998 and is fair under the totality of the facts."

On appeal, plaintiffs argue the amount "shocks the conscience" and "is not proportional to [their] ability to pay it," even as substantially reduced.[7] They rest this argument solely on evidence of their current income at the time of the court's decision, claiming their annual after-tax earnings were

_____

[7] We review the trial court's determination on the amount of costs or fees for abuse of discretion. (*LNSU #1, LLC v. Alta Del Mar Coastal Collection Community Association* (2023) 94 Cal.App.5th 1050, 1081.) "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712, fns. omitted.)

28

"less than $200,000 and are outweighed by greater [unspecified] yearly expenses."

Plaintiffs have forfeited this argument. In challenging the court's factual finding that they *do* have the ability to pay $450,000, plaintiffs have presented a highly incomplete, one-sided recitation of the facts.

The case was filed in March 2019 and went to verdict two years later in June 2021. Plaintiffs fail to mention all of the following:

In 2018, the year before they filed this lawsuit, Dana McAdoo's former employer was acquired by a major, publicly traded technology company, which resulted in a tax bill totaling approximately $90,000 that the trial court found "only makes sense if he received substantial value in connection with the acquisition." And indeed he did. Dana admitted in a declaration the acquisition yielded him an "exceptional" level of compensation that yielded him a "windfall." In 2018, the year before the case was filed, he earned $631,169. The following year, 2019, he earned $413,710. He then went to work for a start-up software company, where he had been working for about a year by the time the fee motion was decided. His wife Livia had been working for a different technology company for seven years. She had earned $174,857 in 2017, $287,488 in 2018, and $290,476 in 2019.

To put this in some perspective, their combined income in just the first *year* of this two-year case (2019) was $704,186–a figure nearly double the amount of the $450,000 attorney fee award.

By the time of the attorney fee motion, the couple's current combined annual salary was $292,000 while Dana was working for the startup. But, typical of Silicon Valley compensation packages, that figure did *not* include their annual bonuses—about which they provided no details other than disclosing that their bonuses were paid "occasionally" and were "not

guaranteed," and which the trial court criticized as incomplete. Plaintiffs also did not say whether they have any stock options, which the trial court also identified as a notable omission. Defendants estimated plaintiffs likely have millions of dollars in stock options,[8] a subject plaintiffs do not address, much less refute, in their appellate brief. They have one child in private school and another in private daycare, for which they can afford to pay nearly $3,000 every month. They have $80,000 in a brokerage account as well as modest retirement savings. And a home of *undisclosed* value in San Jose, California that they have owned for several years, securing $1.4 million in debt.

When challenging the sufficiency of the evidence, an appellant is " 'required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence.* Unless this is done the error assigned is deemed to be waived.' " (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881; accord, *Gajanan Inc. v. City and County of San Francisco* (2022) 77 Cal.App.5th 780, 796.) Plaintiffs' discussion in their appellate brief of only their current after-tax income omits all of the foregoing. It is an incomplete, highly slanted presentation of the relevant evidence. It forfeits our consideration of this issue.

Were the argument not waived we would reject it on the merits. The issue is fully answered by the trial court's thorough analysis, with which we presume the parties' familiarity and we need not repeat. The court thoughtfully considered the parties' financial circumstances despite the

---

[8] This was based on the fact that prior to trial, plaintiffs had argued they lost out on making $500,000 in profits by having to sell stock to buy their San Jose home before the stock value increased due to the acquisition of Dana McAdoo's former employer.

"incomplete" information they chose to share and substantially reduced the amount of attorney fees to which defendants would otherwise be entitled. If anything, the trial court treated plaintiffs generously under the circumstances.

Plaintiffs' challenge to that ruling is undeveloped and unpersuasive. They engage in no legal analysis of this issue; they just argue the facts (as selectively presented). They cite authority that an attorney fee award should not impose "an unreasonable financial burden on the losing party" (*Garcia v. Santana* (2009) 174 Cal.App.4th 464, 475) but the case involved an indigent litigant who had obtained a fee waiver from the court, circumstances that are not even remotely comparable. Plaintiffs do not cite or discuss any authority addressing the limits of a trial court's discretion to impose an attorney fee award against two highly compensated Silicon Valley employees with two cars, a home to borrow against and an untold amount of potential future bonus and/or stock option income. As the trial court put it, "Plaintiffs are well-employed professionals, not indigent parties" who "enjoy a comfortable standard of living."[9] No abuse of discretion has been demonstrated.

Finally, plaintiffs challenge the trial court's award of expert witness costs to defendants.

The precise amount awarded is somewhat unclear. The trial court awarded defendants $115,631 in total costs pursuant to Code of Civil Procedure section 998, and expressly ruled the defendants were entitled to recover expert witness costs, but it struck $6,800 of unspecified claimed costs

---

[9] That sentiment was echoed by plaintiffs' counsel who told the jury in closing argument they "were high wage earners; that's obviously not a crime."

because it found those (unspecified) costs solely related to claims against plaintiffs' child that had been dismissed with a waiver of costs.

On appeal, plaintiffs assert that defendants had claimed a total of $81,769.70 in expert witness costs, and they argue the trial court erred by not striking *all* of defendants requested expert witness costs or, at a minimum, not striking $33,746.23 of costs relating to experts who did not testify at trial.

We reject this argument. Most of plaintiffs' factual assertions are not supported by any citation to the record, and apart from citations to the trial court's ruling, the few record citations they give are inaccurate.[10] Appellate courts disregard arguments that are not supported by citations to the record. (See *East Oakland Stadium Alliance v. City of Oakland* (2023) 89 Cal.App.5th 1226, 1240, fn. 5; *Madrigal v. Hyundai Motor America* (2023) 90 Cal.App.5th 385, 408, fn. 14, review granted, Aug. 30, 2023, S280598.) It is not our job to scour the record for factual support for the claims that appellants make. Furthermore, the argument is not supported by any legal authority or analysis, and it is refuted by the very statute plaintiffs cite.[11] For both these reasons, plaintiffs have failed to meet their burden of demonstrating any error in the cost award.

---

[10] For example, they provide a lengthy paragraph identifying defendants' claimed costs for five expert witnesses whom plaintiffs say should have been disallowed, accompanied by a citation to page 593 of the appendix. Page 593 is a blank page immediately preceding a copy of *plaintiffs'* memorandum of costs.

[11] The only authority plaintiffs cite is subdivision (c)(1) of section 998 of the Code of Civil Procedure. That provision gives the court discretionary authority to award a defendant its post-offer expert witnesses costs that were "actually incurred and reasonably necessary in *either, or both*, preparation for trial . . . , or during trial." (Code Civ. Proc., 998, subd. (c)(1), italics added.) The statute's plain language thus refutes plaintiffs' contention the court had no authority to award expert witness fees for experts who did not testify.

## DISPOSITION

The judgment and the post-judgment award of attorney fees and costs are affirmed.  Respondents shall recover their costs.

_____

STEWART, P. J.

We concur.

_____

RICHMAN, J.

_____

MILLER, J.

*McAdoo v. Wellington* (A163856, A165895)