Filed 6/27/24  In re G.B. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re G.B. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E082460 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J298460 & J298461) |
| v. | OPINION |
| N.B., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Michelle D. Peña, under appointment by the Court of Appeal, for Defendant and Appellant.

1

Tom Bunton, County Counsel, and David Guardado, Deputy County Counsel, for Plaintiff and Respondent.

N.B. (mother) appeals from the juvenile court's orders entered at the combined jurisdictional and dispositional hearing regarding her 10-year-old son, J.B., and her four-year-old daughter, G.B. Mother challenges the sufficiency of the evidence to support the court taking dependency jurisdiction over the children and removing them from her custody based on risk of harm from her substance abuse. (Welf. & Inst. Code,[1] §§ 300, subd. (b)(1), 361, subd. (c).) The evidence included mother overdosing in a gas station parking lot on a family trip out of state, use of drugs around the children, mother's history of substance abuse, and her lack of credibility. As we explain, substantial evidence supports the juvenile court's rulings, which we therefore affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In September 2023, a social worker for San Bernardino County Children and Family Services (CFS) investigated a report that mother "overdosed on benzos and methamphetamine" on a family car trip while passing through Arizona. Arizona child welfare authorities reported that law enforcement responded to a gas station after G.B. exited a vehicle there and was conversing with strangers. Officers found mother "slumped over in a trash can [sic]"; she was incapacitated and had to be transported to a hospital, where she was intubated for two weeks. G.B. thought "'mommy die[d].'" The officers found methamphetamine in the car and mother later admitted to an Arizona social

_____

[1] All further statutory references are to the Welfare and Institutions Code.

2

worker "using methamphetamines and benzos," which drug testing confirmed. Law enforcement also found drug paraphernalia in the car that was accessible to the children.

Mother's companion, Denise T., who was along on the trip, also overdosed and "'woke up in a hospital.'" She tested positive for methamphetamine, benzodiazepine, and marijuana use. Denise admitted she and mother "'made a very bad decision.'" When asked the source of the narcotics, Denise stated "'maybe at the gas station.'" Mother for her part blamed others and repeatedly changed her story. First, while claiming she had "'no idea'" how she ended up in the hospital, she also alleged Denise "put something into her drink." A month or so later, her account morphed into "they" purchased a joint "from a random person" thinking it was marijuana.

After the family returned to Apple Valley, California, the CFS social worker made an unannounced home visit. The worker reported that mother gave her "a hard time" about speaking to J.B. confidentially. Relenting briefly, mother still stood at the doorway nearby and when the worker's questions became more specific, mother "interfered and came inside the home." J.B. was sweating, nervous, and uneasy, and he kept eye contact with mother. When the worker advised mother she would have to sit behind the boy if she wanted to be present, mother ended the interview. That same day, the social worker obtained an interview warrant, and a sheriff's deputy accompanied her back to the home, but mother said J.B. had departed with his adult brother to spend the night at Lake Arrowhead.

3

As they approached the front door upon arriving at the home, the social worker noticed an orange pill bottle on a coffee table where some adults were seated and the deputy saw mother hide something. The deputy inquired when mother answered the door and mother said she put a marijuana pipe in a drawer, pointing with her foot to where she had thrown it. The home was disorganized, smelled of smoke, and mother appeared to be "under the influence" and unable to articulate herself, according to the social worker. Mother claimed just to be nervous and "caught off guard." She reported that J.B. and G.B.'s father died two years earlier from a fentanyl overdose. Mother denied drinking alcohol, denied using drugs besides marijuana, and she claimed her overdose in Arizona was a lone, isolated incident of drug use.

Denise was one of the adults present during the home visit and identified herself as mother's girlfriend. The pill bottle on the table was for her Xanax prescription; she had it out because she had lost the lid, which she suspected G.B. had taken. The social worker cautioned that medications should be stored out of the reach of children. An adult male left during the home visit; mother later claimed he had been holding the pipe, not her, and that he, not her, intended to smoke the pipe.

The social worker attempted to interview G.B., but she did not appear to comprehend the questions posed to her, perhaps due to her age or playful mindset; she preferred to talk about her toys. At the social worker's request, mother agreed to have G.B. stay out of the home that evening pending CFS's investigation; a family friend came and retrieved her.

4

J.B. returned to that friend's home the next day so he could be interviewed without mother interfering. He was guarded but denied being coached. When he reported he was "'worried about being taken away, I love my family, I am a kid and I don't think I can handle being taking away,'" the social worker asked who had told him he was "'getting taken away,'" but he did not respond. J.B. did not attend school but said it was because the family was in the process of moving. J.B. saw the ambulance take mother away in Arizona; he did not know why a police car took Denise away.

The day the social worker interviewed J.B., she also received a confidential phone call from a source that knew the family well; the source reported concern for the children because "there have been times when [mother] has been passed out in the bathtub." Mother claimed she only "experimented" with drug use in her 20's two decades earlier, and she denied use in the interim except for medical marijuana. The source, however, reported seeing mother with a methamphetamine pipe within the last several months.

CFS obtained a detention warrant that day and placed the children with their maternal grandfather and stepgrandmother. J.B. especially was happy to be with his grandfather, whom he had not seen since he was very young. The stepgrandmother indicated she and maternal grandfather "'figured [mother] was back on drugs'" given her long absence. She reported that mother was not a truthful person and tended to "make[] up a pretend life," but nevertheless "really misses her children." The grandparents enrolled J.B. in school (fourth grade), which he loved despite being "behind in . . . forming letters."

CFS filed a dependency petition based on mother's substance abuse. The petition included as an alternate basis allegations that mother engaged in domestic violence in her relationship with Denise, but those were withdrawn upon further investigation. The juvenile court at the detention hearing sustained the children's continuing out-of-home placement and ordered reunification services for mother.

Mother's account of her overdose in Arizona changed again preceding the jurisdiction and disposition hearing. She said "Denise's roommate's boss" created synthetic "medication[s]" and she (mother) believed a "'powder'" that Denise "got" "from her roommate" "'did not sound worrisome'" because it was "'just caffein[e],'" "'100 percent synthetic caffeine,'" and, moreover, mother made sure to "watch[]" Denise for five . . . minutes" after Denise "stuck her finger in the bag and licked it." Having "watched to make sure [of] Denise's behavior," mother "'did the same exact things she did and that's the last thing I remember.'" Mother denied the children were at risk or affected, stating, "'They saw nothing. Didn't even see me.'" Mother claimed the pill bottle the social worker had asked Denise about was "just . . . [Denise's] blood pressure medication."

CFS's reports reflected that, as far as the Arizona social worker knew, mother's drug issue "was a one . . . time incident." The worker believed it may have been a "'relapse gone wrong'" after "the loss of the children's father." The Arizona social worker had "mental health concerns for the mother due to the children's father[']s recent passing." When CFS asked mother about the father, she said he had "'dabbled in drugs a

6

couple of times' so she got very protective of the kids and did not allow him to come home and kept him five . . . houses down." Although the record has some discrepancies, it appears the father died about 15 months before mother's overdose in Arizona.

Mother stated in an interview with CFS that she understood the necessity of erring "on the side of caution when dealing with children" and that she was willing to engage in services of any kind for "how[ever] long the case remains open," but she wanted "the case to be under family maintenance." In the meantime, mother supported the children's placement with maternal grandparents, which J.B. especially loved. CFS regarded mother's prognosis for reunification with the children as "good," noting her "cooperati[on] and . . . willing[ness] to engage in services."

Mother testified at the contested jurisdiction and disposition hearing. She denied ever claiming Denise put something in her drink or that she had purchased a joint in Arizona. She reiterated her claim that she consumed a substance provided by Denise that mother believed was synthetic caffeine. She added that Denise offered the substance because mother noted she was tired, and mother also expanded the timeframe in which she "watched" Denise to ensure the safety of the substance: now 10 minutes instead of five.

Mother admitted her former use of cocaine and methamphetamines required inpatient and outpatient rehabilitation. She explained that was in her 20's, however. Mother implicitly denied using drugs when the social worker and the deputy attempted to interview J.B.; instead, she explained that the pipe she had been holding when the deputy

7

saw her hide something was for marijuana and that the male neighbor who was present intended to smoke it. Mother denied that she opposed or interfered with the social worker's attempt to interview J.B. She wanted him to be seen by a psychologist first so that the interview would "be done very healthfully."

The juvenile court did not find mother credible. Following argument by counsel, including minors' counsel who supported both jurisdiction and continued removal of the children from mother's care, the court made several observations. The court noted mother had "given a number of statements regarding why she tested positive, including the synthetic caffeine story, including the marijuana story, or the joint they bought at the gas station, which is the more likely explanation. I . . . don't believe that a social worker just made that story up."

The court concluded: "Unlike the one time DUI cases that we see, the mother has a history of substance abuse. It appears from what was happening in her home and in this car that it's ongoing. . . . [¶] Mom is in denial about her substance use [and] abuse, particularly in light of her history and the conditions in her home. And I just do not believe she is being forthcoming at all. And I think it's too soon to return these children to her care."

DISCUSSION

Mother challenges the juvenile court's jurisdictional and removal findings, contending that neither is supported by substantial evidence. "'In reviewing the jurisdictional findings and the disposition, we look to see if substantial

8

evidence . . . supports them.'" (*In re R.T.* (2017) 3 Cal.5th 622, 633 (*R.T.*).) As is well settled, "The substantial evidence standard is a difficult hurdle for an appellant . . . . 'If there is any substantial evidence, contradicted or uncontradicted, which will support the judgment, we must affirm.'" (*D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1128.) Substantial evidence is "'evidence which is reasonable, credible, and of solid value.'" (*In re I.C.* (2018) 4 Cal.5th 869, 892.) "'[W]e draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.'" (*R.T.*, at p. 633.)

Ample evidence supports the court's jurisdictional and removal rulings, which we review in turn.

"A jurisdiction finding under section 300, subdivision (b)(1), requires the [child protection agency] to prove three elements: (1) the parent's or guardian's neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601.) Based on a risk of harm, the juvenile court "need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*Id.* at pp. 601-602; see *In re T.V.* (2013) 217 Cal.App.4th 126, 133 ["focus of section 300 is on averting harm to the child"].) The standard of proof is a preponderance of the evidence. (§ 355; *In re N.M.* (2011) 197 Cal.App.4th 159, 168.)

9

The court may consider past events to determine whether the child is presently in need of juvenile court protection. (*In re L.O.* (2021) 67 Cal.App.5th 227, 238.)

On appeal, the appellant bears the burden to show the evidence does not support the contested ruling. (*In re E.E.* (2020) 49 Cal.App.5th 195, 206.) Mother contends the evidence supports her attorney's argument below "that this was a 'one-time mistake. This was not a relapse.'" Mother suggests this case poses the question, as in *In re J.N.* (2010) 181 Cal.App.4th 1010, of "whether evidence of a single episode of parental conduct" is sufficient for jurisdiction. (*Id.* at p. 1022.)

To the contrary, however, the evidence supported the juvenile court's finding that mother's drug problem was "ongoing" rather than like "a one time DUI" case given "what was happening in her home and in this car," her unpersuasive denials, and "her history and the conditions in her home." The evidence supported the conclusion mother was under the influence of illicit substances or other intoxicants while G.B. and J.B. were in her care during the social worker's home visit. The juvenile court could also reasonably conclude mother failed to provide a safe environment where G.B. had access to Denise's Xanax pill bottle, mother while on drugs interfered with the social worker's attempt to interview J.B. for his safety, and mother and other adults were consuming drugs in the home while the children were there. The Legislature has specified that "a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child." (§ 300.2, subd. (a).)

The court could also credit mother's admissions to the Arizona social worker that she sought out drugs from a random person while traveling with her children and that she knew she consumed methamphetamine and benzodiazepine, contrary to her later denials. Together with her overdose, mother's admitted history of substance abuse, while dated, also lent weight to the juvenile court's jurisdiction finding where mother's mental state after the children's father's fentanyl overdose heightened concerns of her own relapse. Mother insisted on alternate, after-the-fact explanations for her conduct at home and on the road, but the court was not required to believe them, and we must view the evidence in the light most favorable to the court's decision. (*R.T.*, *supra*, 3 Cal.5th at p. 633; see *In re R.V.* (2012) 208 Cal.App.4th 837, 843 (*R.V.*) [conflicts in credibility and weight of evidence resolved in favor of order].)

While mother is correct that the juvenile court was mistaken in thinking that J.B. said there were other times apart from the Arizona incident in which it was difficult to wake his mother up, the record included evidence from the confidential source that mother passed out repeatedly at home in the bathtub. Given mother's risky substance abuse at home and elsewhere, the court could properly determine dependency protection was warranted. A parent's narcotics abuse compromising the "ability to care for [her] child, thus justif[ies] the assumption of jurisdiction." (*In re R.R.* (2010) 187 Cal.App.4th 1264, 1284.)

Mother argues proof of risk to the children was absent where, "[n]otably, when she experienced the overdose, they were still cared for by a family friend." It turned out that

11

mother's friend, "Bobbie, came out to the gas station that night and picked the children up," as reflected in mother's account to the social worker. The fortuity that a friend lived nearby when mother and Denise overdosed on a road trip does not absolve mother of the danger she created nor of the harm she inflicted. Both she and Denise were incapacitated, leaving G.B. to fend for herself among strangers in the parking lot, and J.B. was frightened also, including at the friend's residence.

Mother's reference to Bobbie reflects ongoing denial about the effects of her substance abuse on her children (e.g., "'They saw nothing'"). Mother's refusal to face the reality of her conduct supported jurisdiction, where G.B. feared mother had died and J.B. saw her transported away in an ambulance. A parent's failure to recognize negative impacts is relevant to determining risk and whether he or she is likely to modify behavior, further supporting jurisdiction here. (*In re A.F.* (2016) 3 Cal.App.5th 283, 293; *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044.)

The same evidence supporting the juvenile court's jurisdictional finding also supports the court's decision to remove the children from mother's custody.

Before the court may order a child physically removed from his or her parent, it must find by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the . . . parent's . . . custody." (§ 361, subd. (c)(1); *In re Hailey T.* (2012) 212 Cal.App.4th

12

139, 145-146.) Removal "is a last resort, to be considered only when the child would be in danger if allowed to reside with the parent." (*In re Henry V.* (2004) 119 Cal.App.4th 522, 525.)

While mother observes that G.B. is enjoying visits with her during reunification and J.B. "loved" living at home with her, she does not meaningfully dispute the basis for the court's removal order. Nor could she. A removal order is proper when "based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1163.) As discussed, that standard was met here.

Instead of a frontal attack on the court's order removing the children from her custody, mother argues the court erred by failing to consider alternatives that her attorney proposed at the hearing for others to assist mother in keeping the children at home. In particular, counsel stated that mother "is willing to have support people move in with her, including her adult son Benjamin who is here with her today." Counsel added opaquely: "The grandparents can still be an active part of the children's lives and the mother's life, and help monitor for the Department."

"Although the court must consider alternatives to removal, it has broad discretion in making a dispositional order." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 918.) Here, the juvenile court concluded that reasonable efforts had been made to prevent the need to remove J.B. and G.B. from mother's home and there were no reasonable means to protect

13

the children without removal. Typically, such a finding, if supported by substantial evidence, will support a removal order. (*Ibid.*)

We find no abuse of discretion in the juvenile court's decision not to place the children with mother's adult son Benjamin, with or without whatever vague assistance counsel may have been suggesting for the grandparents to provide. Mother did not volunteer Benjamin at any time before the hearing for CFS to inquire into his suitability as a caretaker for the children or to monitor mother. Rather, mother supported placing J.B. and G.B. with her parents. Nor did Benjamin testify or otherwise indicate he was willing or able to take on these roles. Nor does the record support a supervisory role for the maternal grandparents in mother's home in Apple Valley when it appears they lived in Los Angeles County. That distance would remain considerable even if mother finally completed a move she had been contemplating to Fontana. Consequently, we find no error in the court's order removing the children from mother's custody and failing to place them in her and Benjamin's care.

DISPOSITION

The juvenile court's jurisdictional and dispositional orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>McKINSTER</u>
Acting P. J.

We concur:

<u>RAPHAEL</u>
J.

<u>MENETREZ</u>
J.

15